PROGRESSIVE CASUALTY INSUR-
ANCE COMPANY, the Reinsurance
Corporation of New York, Christiana
General Insurance Corporation of New
York, Worcester Insurance Company,
Pennsylvania Lumbermens Mutual In-
surance Company, Colonia Insurance
Company, United Reinsurance Corpo-
ration of New York, United Fire and
Casualty Company, Plaintiffs,

v.

C.A. REASEGURADORA NACIONAL
DE VENEZUELA, Defendant.

No. 91 Civ. 4580(CSH).

United States District Court,
S.D. New York.

Sept. 30, 1992.

Kroll & Tract, New York City (James W. Carbin, Michael J. Carcich, Adam G.L. Kominsky, of counsel), for plaintiffs.

Debevoise & Plimpton, New York City (Donald Francis Donovan, Alexander Ewing, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this action, plaintiffs are American insurance companies and retroceded reinsurers of risks covered by the defendant reinsurer, a Venezuelan company. Two casualty claims submitted by the insured have given rise to disputes between plaintiffs and defendant with respect to the parties' rights and obligations under the reinsurance policy between them.

Invoking this Court's diversity jurisdiction, 28 U.S.C. § 1332(a)(2), plaintiffs seek declaratory relief, 28 U.S.C. § 2201, that they are not liable on one of the casualties, and are entitled to the return of monies they paid to defendant on the second.

Defendant now moves under the Federal Arbitration Act, 9 U.S.C. §§ 1, 3 (the "Arbitration Act"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S. 2517, T.I.A.S. No. 6997, codified at 9 U.S.C. §§ 201–207 (the "New York Convention"),[1] to stay the action pending arbitration. Plaintiffs cross-move to enjoin defendant from proceeding with arbitration.

### Background

Petroleos de Venezuela ("PDVSA") is an oil and gas exploration and development company owned by the Venezuelan government. PDVSA sought insurance from a group of Venezuelan insurance companies (the "direct insurers"). In addition to marine hull and pollution risks, the direct insurers covered the risk of a surface blow-out of a drilling site. The direct insurers reinsured their risk with defendant C.A. Reaseguradora Nacional de Venezuela ("RNV"). RNV decided to retrocede this risk through a London based broker, Sedgwick Marine and Cargo Ltd. ("Sedgwick")[2]. Sedgwick placed ninety percent of this risk in the London reinsurance market. The remaining ten percent was placed in the American reinsurance market through an affiliate of Sedgwick, Fred. S. James & Co., Inc. ("James"). James placed the risk with New York Marine Managers, Inc. ("NYMM"), which acted as the underwriting agent for plaintiffs[3]. Beginning in 1983, plaintiffs entered into a series of one year retrocession agreements with defendant. Shortly before each agreement was entered into, NYMM and Sedgwick would discuss the terms of coverage. On the basis of these discussions, Sedgwick would

---

1. So called because the Convention is dated at New York June 10, 1958. It was made enforceable in the United States by enactment of Chapter 2 at the Arbitration Act on July 31, 1970. 84 Stat. 692.

2. A retrocession is reinsurance of reinsurance.

3. NYMM subsequently changed its name to Somerset Marine, Inc. I will refer to the company as NYMM.

then present NYMM with an insurance application or "slip". A slip is a broad outline of an insurance agreement. As is the practice in the insurance industry, the gaps in the slip were filled in by a more detailed document, known as the "policy," issued subsequently and also sent by Sedgwick or James to NYMM to be signed.

The dispute in the case at bar concerns the agreement providing coverage for the year 1989. NYMM signed the slip for the 1989 coverage on February 16, 1988. On May 19, 1988 the parties agreed to Endorsement No. 6, which among other things contains the London Following Clause. The London Following Clause provides:

> This Insurance is subject to the same terms and conditions as London Underwriters' Policies and it is agreed, with or without previous notice, to follow the leading London Underwriters in regard to alterations, extensions, additions, endorsements and attaching and expiry dates and also in regard to survey and settlement of claims and returns, whether liable or not liable, even if settlement is made 'without prejudice' or on 'ex gratia' basis.

Murphy Reply Declaration Ex A. at 3.

The policy in question was signed on August 31, 1988. It contains the phrase "Subject to Facultative Reinsurance Agreement" ("FRA"). According to RNV, this phrase referred to an agreement entered into 1977 by PDVSA, the direct insurers, and some London based reinsurers. The FRA contains administrative provisions, including timing of payments, provisions for letters of credit, and an arbitration clause. Wood Declaration ¶ 7.

The arbitration clause is contained in Article XVII of the FRA, which provides in relevant part:

> Any question or dispute arising between the contracting parties concerning the interpretation of this Reinsurance Agreement, which cannot be otherwise arranged shall be settled by arbitration in London, England.
> Each party shall appoint, within thirty (30) days after the arbitration is re-

quired, an Arbitrator, and the Arbitrators shall appoint an Umpire. The said Arbitrators and the Umpire shall be executive officers of Insurance or Reinsurance Companies.

On August 8, 1989, defendant, through Sedgwick, submitted to plaintiffs through NYMM a claim for a blowout at a drill site, the CARI–6. On October 23, 1989 defendant, again through Sedgwick, submitted a claim of $1 million for expenses incurred to control a blowout of the TEJERO 2E well. In June 1990 NYMM paid out $1 million to cover the CARI–6 claim. On December 10, 1990 NYMM rejected defendant's TEJERO 2E claim, stating that it was not covered by the policy. On December 11, 1990, NYMM, acting for plaintiffs, informed Sedgwick that the $1 million payout for the CARI–6 claim was made in error and was not covered by the policy.

In this action, plaintiffs seek a declaration that the TEJERO 2E well claim is not covered by the terms of the retrocession and an order to compel defendant to return the $1 million dollars paid on the CARI–6 well claim. Defendant moves to stay the action because the parties agreed to arbitrate disputes. Plaintiffs deny the existence of a contract binding them to arbitrate, and cross-move to enjoin arbitration.

The case for defendant RNV is that the arbitration agreement in the 1977 Facultative Reinsurance is binding on plaintiffs by virtue of that agreement's incorporation in the policy, and that the disputed claims are arbitrable under the clause.

The case for plaintiffs is that, for several reasons, they are not bound by that arbitration clause, and that in any event the disputes at bar do not fall within its scope.

### Discussion

To determine the arbitrability of particular claims, courts engage in a two-fold inquiry: "whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims." *David L. Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d 245, 249 (2d Cir.1991). Where the parties have agreed

to arbitrate, " 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration' " *Threlkeld* at 248 (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). That is because federal law, as expressed in the Arbitration Act and the New York Convention, "strongly favors arbitration as an alternative dispute resolution process," and therefore imposes a "presumption of arbitrability." *Threlkeld* at 248. The Supreme Court has said that the "emphatic federal policy in favor of arbitral dispute resolution ... applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985).

■ While these considerations impact upon the scope of an arbitration agreement, they have nothing to do with the first prong of judicial inquiry: whether the parties agreed to arbitrate in the first place. "Dispute resolution by arbitration is and must be consensual." *Continental Group v. NPS Communications, Inc.*, 873 F.2d 613, 617 (2d Cir.1989). A party seeking to compel another to arbitrate a particular dispute must show that its adversary agreed to do so. That is true under New York law. "[P]arties to a commercial transaction 'will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence of an express, unequivocal agreement to that effect; absent such an explicit commitment neither party may be compelled to arbitrate.' " *Matter of Marlene Industries Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327, 333, 408 N.Y.S.2d 410, 413, 380 N.E.2d 239, 242 (1978), *quoting Matter of Acting Supt. of Schools of Liverpool Central School Dist. [United Liverpool Faculty Assn.]*, 42 N.Y.2d 509, 512, 399 N.Y.S.2d 189, 369 N.E.2d 746 (1977). It is equally true under federal law. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *McAllister Brothers v. A & S Transportation Co.*, 621 F.2d 519, 522 (2d Cir.1980), *quoting United Steel Workers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Where the making of a binding arbitration agreement is at issue, the Arbitration Act provides for summary trial in the district court. 9 U.S.C. § 4.

■ In approaching these issues, the parties debate at some length which of two international conventions governs the case.

Seeking to compel arbitration, defendant relies upon the New York Convention, Article II(1) of which provides:

Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

The Arbitration Act, 9 U.S.C. § 202, implements the Convention by providing:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention.

Those provisions of the Arbitration Act implementing the Convention form Chapter 2 of the statute. 9 U.S.C. § 208 provides:

Chapter 1 applies to actions and proceedings brought under this chapter to the extent that that chapter is not in conflict with this chapter or the Convention as ratified by the United States.

Chapter 1 of the Act includes, at 9 U.S.C. § 3, the provision upon which defendant relies in seeking a stay pending arbitration that section provides:

If any suit or proceeding be brought in any of the court of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit or proceeding is referable to arbitration under such an agreement, shall on appli-

cation of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Plaintiffs say that the New York Convention does not apply to the case at bar because Venezuela, where defendant is incorporated, does not adhere to the Convention. Rather, plaintiffs contend that the case is governed by the Inter–American Convention on International Commercial Arbitration ("Inter–American Convention"), enforceable in the United States pursuant to Chapter 3 of the Arbitration Act, 9 U.S.C. §§ 301–304.

Congress added Chapter 3 to the statute by Pub.L. 101–369, § 1, August 15, 1990, 104 Stat. 448. Accordingly, the Inter–American Convention must be applied retroactively if it is to affect the rights and obligations of the parties to the contract in suit. Plaintiffs argue for retroactive application by analogizing the case at bar to *Fertilizer Corp. of India v. IDI Management, Inc.*, 517 F.Supp. 948, 951–52 (S.D.Ohio 1981) (New York Convention applied retroactively to previously executed contract because "the Convention does not affect the parties' substantive rights"). For comparable reasons, the Second Circuit affirmed the district court and applied the New York Convention retroactively to an arbitration agreement and award which predated the United States' accession in 1970. *Fotochrome, Inc. v. Copal Company, Ltd.*, 517 F.2d 512, 515 n. 3 (2d Cir. 1975):

> As Judge Weinstein noted, though the United States acceded to the Convention after the contract in suit was signed and shortly after the award was made, the Convention contains no prospective language and should be applied retroactively to existing arbitration agreements and awards. [*In re Fotochrome, Inc.*] 377 F.Supp. [26] at 30 [D.C.N.Y.1974], citing Quigley, Convention on Foreign Arbitration Awards, 58 A.B.A.J. 821, 822 (1972).

These cases may fairly be analogized to the Inter–American Convention, particular-

ly since the legislative history of chapter 3 of the Arbitration Act notes:

> The Inter–American Convention is modeled after an earlier United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, to which the United States became a party in 1970 ("New York Convention"). H.Rep. 101–501, 4 U.S.Cong. and Admin.News 676, 101 Cong., 2d Sess. (1990), U.S.Code Cong. & Admin.News 1990, pp. 675, 676.

There is no prospective language in either convention. I conclude that the Inter–American Convention may apply retroactively to the contract at bar.

RNV says that New York Convention applies, notwithstanding the non-adherence of Venezuela, because by its terms the United States has agreed to enforce awards "made in the territory of another Contracting state," and the United Kingdom (where the arbitration would be held) also adheres to the Convention. *See* notes of ratification 42 and 43, following 9 U.S.C. § 201 (West's Cumulative Annual Pocket Part 1992) at 252–53. The Fifth Circuit's decision in *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 331, 335 (5th Cir.) *cert. denied*, 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987), cited by RNV, may be read to support that proposition, although the issue is not clear. I need not resolve it, however, because assuming the applicability to the case at bar of the New York Convention as well as the Inter–American Convention, the latter takes precedence under 9 U.S.C. § 305. That section of the enabling domestic legislation provides:

> When the requirements for application of both the Inter–American Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, are met, determination as to which Convention applies shall, unless otherwise expressly agreed, by made as follows:
>
> (1) If a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the Inter–American Convention

and are member States of the Organization of American States, the Inter–American Convention shall apply.

(2) In all other cases the Convention of the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall apply.

The New York Convention and the Inter–American Convention both represent current legal and political thinking favoring arbitration as a means of alternate dispute resolution. In § 305 Congress sensibly provided for choosing between the two conventions if both applied to a given contract. In the case at bar, plaintiffs are American corporations. RNV is a Venezuelan corporation. Both the United States and Venezuela have ratified or acceded to the Inter–American Convention and are member states of the Organization of American States. Accordingly the Inter–American Convention controls pursuant to § 305(1).

■ The next issue is whether any of this has any practical consequence. Plaintiffs say that there is a substantial difference between the two conventions. RNV says there is none. The dispute arises out of the language used by the conventions to describe an enforceable arbitration agreement. ·

Article II(1) of the New York Convention (following 9 U.S.C. § 201) declares the recognition by each Contracting state of "an agreement in writing under which the parties undertake to submit to arbitration" their differences. . Article II(2) provides:

The term "agreement in writing" shall include an arbitrable clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

Article 1 of the Inter–American Convention (following 9 U.S.C. § 301) provides: "An agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid. The agreement shall be set forth in an instrument signed by the parties, or in the form of an exchange of letters, telegrams, or telex communications."

It is generally held by cases decided under the New York Convention that an enforceable arbitration clause may be included in a document or form incorporated by reference in the parties' contract. *See e.g.*, *Threlkeld* at 247, 249 (contracts made "subject to the current rules and regulations of the London Metal Exchange" which in turn contained arbitration agreements held to be binding upon the contracting parties); *S.A. Mineracao da Trindade–Samitri v. Utah International*, 745 F.2d 190, 196 (2d Cir.1984) (1982 memorandum of agreement incorporated by reference arbitration clauses contained in 1974 and 1977 agreements.)

RNV relies upon such authority in contending that the phrase in the 1989 reinsurance policy "Subject to Facultative Reinsurance Agreement" incorporates by reference the arbitration clause contained in that agreement. ·

Plaintiffs argue that the appearance of the word "instrument" in Article 1 of the Inter–American Convention "clearly sets up a different standard" from the New York Convention, reply brief at 5, and that plaintiffs never signed the "instrument containing the arbitration agreement," namely, the FRA.

There is no substance to this argument, which exalts almost imperceptible form over substance grounded in public policy. Article 1 of the of the Inter–American Convention says that an arbitration agreement "shall be set forth in an instrument signed by the parties, or in the form of an exchange of letters, telegrams, or telex communications." Article II(2) of the New York Convention says that the term "agreement in writing" shall include an arbitrable clause "in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." The only difference between the two Conventions is that one says "instrument" and the other says "contract or an arbitration agreement."

I am not inclined to build a brick of substantive difference from such frail straws, particularly where Congress has

recognized that the more recent convention was "modeled after" the earlier one. A difference in definitions of enforceable arbitration agreements would be a fundamental one, significantly departing from the model rather than following it. Both conventions employ the phrase "signed by the parties," and provide for the alternative form of agreement in "an exchange of letters, telegrams or telex communications," Inter–American Convention; *compare* New York Convention (contained "in an exchange of letters or telegrams"). One may presume that difference in wording reflects the fact that in 1958 the telex had not yet been invented. But there is no reason to accept, and every reason to reject, the notion that the conventions differ with respect to the form and content of the writings sufficient to contain an enforceable arbitration agreement.

Therefore I reject plaintiffs' contention that the different wordings of the conventions require different results. It follows that the incorporation-by-reference cases decided under the New York Convention apply to contracts falling under the Inter–American Convention. There is, of course, no question that the parties signed the policy in suit.

But that conclusion does not end the analysis, it only sets its stage. Plaintiffs put forward three additional arguments: first, that plaintiffs never agreed to include the terms of the FRA as part of the retrocession insurance agreement between plaintiffs and RNV, so that the policy should be reformed to eliminate the reference in it to the FRA; second, that even if the wording of the policy is left unreformed, its reference to the FRA is not sufficient to incorporate the FRA into the policy; and third, the disputes which form the subject of this action are in any event not within the scope of the arbitration clause contained in the FRA.

NYMM signed two documents on behalf of plaintiffs. The first was the "application of insurance" dated January 6, 1988 submitted by James to NYMM which Norman A. Tucker, NYMM's executive vice president, endorsed as binding on plaintiffs on February 16, 1988. I have previously referred to that document as the "slip." The slip summarized the outlines of the policy. It incorporated by reference certain industry ("Institute") clauses and conditions. *See, e.g.,* the reference in section IA, "Original Insuring Conditions," to "all other vessels and Craft":

> As above but Institute time clauses— hulls (1.10.83) amended to cover all risks of loss or damage and with Clause 8 amended to four fourths Liability thereon. Clauses 24 and 25 deleted.

There is no reference in the slip to the FRA.

The first reference to the FRA appears in the policy itself, which James submitted to NYMM for signature in August 1988. As previously noted, the policy contained among its numerous provisions the phrase "Subject to Facultative Reinsurance Agreement." That phrase also appears in the London policy by which London insurers undertook ninety percent of the reinsurance risk. In New York, the policy came to the attention of Michael Civisca, manager of NYMM's hull and yacht department. He signed the policy on behalf of plaintiffs. But Civisca protests that "[a]t no time was I advised that the formal policy wording supposedly contained an incorporation of the so-called 'FRA' ", and that had he been so advised, he "would have refused to sign the formal policy wording as presented by James." First Civisca affidavit at ¶¶ 10–11.

Opposing affidavits submitted by the parties take quite different views of the FRA. RNV relies upon a reply declaration of A.H. Wood, a Sedgwick director who has over 25 years' experience in the international insurance brokerage industry. Wood says that the provisions of the FRA "were standard in policies like this one," had "regularly been incorporated for over 10 years into reinsurance policies where the direct insured were PVDSA or one of its affiliates"; and were not inconsistent with the basic terms of the retrocession in the application of insurance (the slip). ¶ 8. Plaintiffs rely upon the reply affidavit of Tucker, with "nigh 40 years" of experience

in the insurance industry in London and the United States, who says that "I have *never* seen an agreement such as the Facultative Reinsurance Agreement which RNV now seeks to include in the retrocession policy of insurance as a 'standard' provision." ¶ 5. Tucker "entirely disagree[s]" with Wood's declaration "that the FRA is 'standard' provision in the RNV or any other type of policy," and challenges Wood's assertion that it has been in the PDVSA RNV retrocession account for over ten years."

■ The disputed character of the FRA is material because, under New York law, courts will infer that a binder is conditioned by the "limitations usual to the contemplated coverage," on the assumption that "many policy clauses are either stereotypes or mandated by public regulation." *Employers Commercial Union Insurance Co. v. Firemen's Fund Insurance Co.*, 45 N.Y.2d 608, 612–13, 412 N.Y.S.2d 121, 124, 384 N.E.2d 668, 670 (1978). *See also Westchester Resco Co. L.P. v. New England Reinsurance Corp.*, 648 F.Supp. 842, 846–47 (S.D.N.Y.1986) ("... the policy was merely to formalize what everyone had agreed on while adding the usual stereotypical terms and limitations.") In *Westchester Resco* Judge Sweet, interpreting the decision of the New York Court of Appeals in *Employers*, said:

> In essence, the Court of Appeals has determined that there are two distinct types of terms in an insurance contract: the terms unique to the deal, over which the parties bargain and memorialize in a binder; and the term that are the "usual" or "stereotypical" conditions and limitations, which are not bargained over and which are spelled out fully for the first time in the policy. *Id.* at 845–46.

I interpret *Employers* to mean that if terms may fairly be characterized as "usual" or "stereotypical," they form a part of the policy even if not referred to in the binder; if not, not.

That perception is apparently shared by RNV, which argues in its reply brief at 8 that "[t]here is no dispute that the Facultative Agreement contains reinsurance provisions that were routinely incorporated into reinsurance policies like this one." But there is a dispute; Tucker forcefully flings down the gauntlet in his reply affidavit; and if the case turns on the point, I do not think it can be resolved by a battle of affidavits. As noted, the Arbitration Act provides for plenary trial if "the making of the arbitration agreement ... be in issue ..." 9 U.S.C. § 4.

However, RNV, which also has more than one string to its bow, argues that the London Following Clause makes the reference to the FRA a part of the policy with these American plaintiffs.

The London Following Clause, quoted *supra*, is described by Wood in ¶ 10 of his reply declaration as being "used when more than one insurance or reinsurance market bears a share of the identical risk. It reduces costs by having certain leading reinsurers, whose expertise is respected by the other reinsurers, negotiate the policy terms on behalf of all the reinsurers regardless of location." Wood's reply declaration attaches as an exhibit a copy of the London policy covering these risks. It appears that the London insurers agreed, with respect to sections I, II and III of the policy, that the policy was "subject to Facultative Reinsurance Agreement." Section I of the policy covers hulls and machinery of vessels and craft in which the original insured have an interest; section II covers the original insured's liabilities for seepage, pollution and contamination; and section III covers the cost of control, including re-drilling expenses, in respect of the original insured's 1988 drilling program in Venezuela. The claims at issue fall under § III. RNV argues that the London reinsurers having agreed to making all aspects of their policy subject to the FRA, plaintiffs are equally bound under the London Following Clause. In addition to Wood's declaration, RNV relies upon *Bank of Rockville Centre Trust Co. v. Baldwin*, 238 App.Div. 354, 265 N.Y.S. 343 (1st Dept. 1933), and *National Factors, Inc. v. Waters*, 42 Misc.2d 822, 249 N.Y.S.2d 121 (Sup. Ct.N.Y.Cty.1964).

In *Baldwin*, where the coverage of policies issued by underwriters at Lloyds was

disputed, each policy contained the statement: "Warranted same terms and conditions as and to follow settlements of the Firemen's of Newark." The appellate division described the effect of that provision as follows:

> In each of the Lloyds policies reference is thus made to the provisions contained in a policy issued by the Firemen's of Newark. These references have the same effect as though the entire policy issued by the Firemen's of Newark, including the provisions contained in the loss payable clause therein, was incorporated in the policies issued by Lloyds. By such incorporation the terms of the Newark policy became part of the Lloyds policies. The reference to the Newark policy was clearly included to avoid any misapprehension so to the terms and conditions of Lloyds policies. 265 N.Y.S. at 348.

*Waters* cites *Baldwin* and reaches the same result with respect to a policy containing an identical provision ("warranted same terms and conditions as and to follow the settlements of Liverpool & London & Globe Insurance accompany ...") 249 N.Y.S.2d at 123. The court said: "These references in the 'warranty clause' have been judicially determined to have the same effect as though the entire Liverpool policy was incorporated in the Lloyds policy, and by such incorporation all the terms of the former become a part of the latter." *Id.* 249 N.Y.S.2d at 127 (citing *Baldwin*).

These relatively clear-cut decisions are more accurately characterized as "warranty clause" cases, rather than "following clause" cases. The case at bar is more complicated and more ambiguous. As plaintiffs observe, Endorsement No. 6 to the policy in suit is a three-page document. The first page begins with this statement:

> It is hereby noted and agreed underwriters hereunder agree to follow leading underwriters with respect to amendments as per the attached slip.

That declaration is immediately followed by this provision:

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

The second page of the Endorsement recites the names of the three reassureds (one of them being RNV), provides that separate policies will be issued for each, and concludes:

> Accordingly all other terms, clauses and considerations as per London market and London market following clause as attached.

The London Following Clause then appears on the third page of the Endorsement, in the text which I have previously quoted.

Unlike the clauses in *Baldwin* and *Waters,* nothing in Endorsement No. 6 warrants that plaintiffs' American policy will contain the "same terms and conditions" as the London policy. The "following" provision in the *Baldwin* and *Waters* cases related solely to settlements made by the underwriters referred to, a question that arises after a casualty, and does not affect the nature or scope of coverage, which is at issue here. I agree with plaintiffs that ambiguities arise from the coupling in Endorsement No. 6 of the Following Clause with the provision that "all other terms and conditions [of the American Policy] remain unchanged." Finally, Tucker's reply affidavit points to exchanges of telexes between Sedgwick and NYMM subsequent to the execution of Endorsement No. 6 which are arguably inconsistent with the interpretation RNV places upon the Following Clause.

Again, I take the view that if the case turns upon the meaning and intent of the London Following Clause, the issue cannot be resolved on affidavits and must be explored by trial.

Assuming *arguendo* that the phrase "Subject to Facultative Reinsurance Agreement" forms a part of the policy in suit, plaintiffs contend that it is insufficient to incorporate the terms of the particular FRA in question, including its arbitration clause, into the policy. They rely upon *Chiacchia v. National Westminster Bank USA,* 124 A.D.2d 626, 507 N.Y.S.2d 888, 889–90 (2d Dept.1986), for the proposition that "[t]he doctrine of incorporation by reference requires that the paper to be incorporated into a written instrument by refer-

ence, must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt."

"Facultative reinsurance" is a form of reinsurance. It may be contrasted with "treaty" reinsurance. Facultative reinsurance involves the offer of a portion of a particular risk to one or more potential reinsurers, who are free to accept or reject that risk, in whole or in part. Treaty reinsurance involves an ongoing agreement between two insurance companies, binding one in advance to cede and the other to accept certain reinsurance business pursuant to the provisions of the treaty. *See Christiana General Insurance Corp. of New York v. Great American Insurance Company,* 745 F.Supp. 150, 152 (S.D.N.Y.), *reh'g denied,* 1990 WL 212950, 1990 U.S.Dist. LEXIS 17018 (S.D.N.Y.1990). A facultative reinsurance agreement, then, is an agreement dealing with particular aspects of facultative reinsurance.

The facultative reinsurance agreement in the case at bar is attached as Exhibit A to Wood's initial declaration. Its caption refers to PDVSA's 1977 insurance program. The agreement recites that it is between certain specified Venezuelan insurance companies (the "ceding companies") which have issued policies in favor of PDVSA, and "on the other part, the Insurance or Reinsurance companies and/or underwriters at Lloyd's ... whose signatures appear in the schedule attached hereto" (the reinsurers). That schedule is not attached to the exhibit, but it appears to be common ground that plaintiffs at bar did not sign the 1977 agreement.

Plaintiffs say that the terse reference in the policy to a "Facultative Reinsurance Agreement" is not sufficient to incorporate that particular 1977 agreement. They rely upon the principle of law articulated in *Chiacchia.*

RNV seeks to distinguish *Chiacchia* on the facts. The suit involved a claim against a bank by a safe deposit box depositor. Money was stolen from the box. The bank disclaimed responsibility on the basis of a document entitled "Rules for your Safe Deposit Box Service." Plaintiff had signed a rental agreement providing that she "agrees to the rules and regulations of the Bank in force at this date." The appellate division held that this was an insufficient reference to incorporate a particular document, not directly referred to or otherwise described. RNV argues that, unlike *Chiacchia,* the policy refers to a specific document to be incorporated, namely "Facultative Reinsurance Agreement"; that such document was well known in the industry; and that in 1987 NYMM executed an endorsement covering the same risks as the policy in suit that included the term "Subject to Facultative Reinsurance Agreement." That 1987 endorsement appears as an exhibit to Wood's reply declaration. It contains the phrase "Subject to Facultative Reinsurance Agreement as expiring or as agreed" underneath the caption: "APPLYING TO SECTIONS I AND II."

Plaintiffs reply that "thousands" of agreements relating to facultative reinsurance "are entered into by insurance companies on virtually a daily basis," Reply brief at 16, and the reference in the policy to an unspecified agreement, with no descriptive details and concerning which neither NYMM nor plaintiffs received any information, does not suffice to incorporate into the policy that particular FRA with that particular arbitration clause upon which RNV relies.

Once again, these contentions pose triable issues of fact with respect to what the parties intended and understood by the phrases used.

■ Plaintiff's next argument is that even if the 1977 FRA be deemed incorporated into the 1989 policy, the FRA's arbitration clause is not binding on them. I agree.

The FRA is between specified Venezuelan direct insurers and specified English reinsurers. Plaintiffs are not parties to that contract. There is no dispute about that. As for the arbitration clause contained in the FRA, it requires arbitration of "[a]ny question or dispute arising between the contracting parties concerning the interpretation of this Reinsurance Agreement ..."

It is well settled in this circuit that an arbitration agreement restricted to the immediate parties does not bind a non-party, notwithstanding words of incorporation or reference in a separate contract by which that non-party is bound. *See Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 973 (2d Cir.1975); *Import Export Steel Corp. v. Mississippi Valley Barge Line Co.*, 351 F.2d 503, 505–06 (2d Cir.1965); *Lowry & Co. v. S.S. le Moyne D'Iberville*, 253 F.Supp. 396 (S.D.N.Y.1966), *appeal dismissed*, 372 F.2d 123 (2d Cir.1967); *Production Steel Company of Illinois v. S.S. Francois L.D.*, 294 F.Supp. 200, 201–02 (S.D.N.Y.1968).

*Nereus* involved a long term contract of affreightment taking the form of a charter party. The contract contained an arbitration clause. Arbitration was sought against a company which not only guaranteed the performance of one of the parties to that contract, but also agreed to "assume the rights and obligations" of that party. The Second Circuit concluded that "the duty to arbitrate was indeed one of the rights and obligations under the contract which Cepsa, as guarantor, agreed to assume." 527 F.2d at 974. Judge Medina's opinion prefaces that conclusion with this discussion:

> The determination of whether a guarantor is bound by an arbitration clause contained in the original contract necessarily turns on the language chosen by the parties in the guaranty. We are aided in our construction of the language here by prior decisions which make clear that where an arbitration clause is applicable by its own terms to all disputes and is not limited to those arising between the Owner and Charterer, the agreement to arbitrate binds "not only the original parties, but also all those who subsequently consent to be bound by [the terms of the contract]." *Lowry & Co. v. S.S. Le Moyne D'Iberville*, 253 F.Supp. 396, 398 (S.D.N.Y.1966), *appeal dismissed*, 372 F.2d 123 (2d Cir.1967). *See also Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687, 688 (2d Cir.1952). *Id.* at 973.

In *Lowry*, cited and quoted by the Second Circuit in *Nereus*, Judge Weinfeld dealt with a bill of lading which provided: "All conditions and exceptions as per charter party dated Paris 17th September, 1963." The charter party in turn incorporated an arbitration clause providing that "all disputes .. arising out of this contract shall ... be referred to" arbitration. Judge Weinfeld held that the charter party arbitration clause was binding upon the non-party transferee of the bill of lading, reasoning that the arbitration clause "is broad enough to bind [the bill of lading transferee] as well as the original parties to the charter party, provided it was effectively incorporated into the bills of lading." 253 F.Supp. at 398. Judge Weinfeld distinguished the cases upon which the plaintiff, seeking to avoid arbitration, relied:

> It is true that a charter party provision for arbitration of disputes which is restricted to the immediate parties or limited to disputes "between the * * * Owners and the Charterers," as was the case in *Import Export Steel v. Mississippi Valley Barge Line Co.*, so heavily relied upon by libelant, does not bind any but the named persons. On the other hand, an agreement to arbitrate all "disputes * * * arising out of this charter" binds not only the original parties, but also all those who subsequently consent to be bound by its terms. *Id.* at 398.

*Import Export Steel Corp. v. Mississippi Valley Barge Line Co.*, 351 F.2d 503 (2d Cir.1965), which Judge Weinfeld distinguished in *Lowry*, more closely resembles the case at bar. In *Import Export* the Second Circuit refused to compel the cargo owner and bill of lading holder to arbitrate with the ship owner and charterer where the arbitration clause in the charter party, incorporated by reference in the bill of lading, was limited to disputes between those specified parties. The Second Circuit said at 505–06:

> Furthermore, the language of the arbitration clause incorporated in the bills of lading is restrictive in scope in that it is limited to disputes "between the Disponet Owners and the Charterers." It is

narrower than the corresponding provision in *Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687 (2 Cir.1952), which referred to arbitration "Any and all differences and disputes of whatsoever nature arising out of this charter * * *." Since the bill of lading is the only document which regulates the relations of transferee of the bill of lading with the owner, its terms, including those incorporated therein, should be carefully if not restrictively construed. See Gilmore and Black, Law of Admiralty, at 194 (1957). It would be unduly stretching the language of this arbitration clause to say that Impex, a mere notify party, or even owner of the cargo as it claims to be, is one of the "Disponent Owners" or "Charterers."

District Judge Mansfield (as he then was) reached the same conclusion in *Production Steel*. The case is illuminating because, as in the case at bar, the words of alleged incorporation began with the phrase "subject to." The cargo bill of lading provided: "Subject To All Terms, Conditions and Exceptions of Charter Party Dated 2nd, November, 1964 at New York." The arbitration clause contained in the charter party required arbitration "[s]hould any dispute arise between the Owners and the Charterers ..." The court held that the cargo owner could not be compelled to arbitrate a claim for damage suffered during the ocean voyage. Judge Mansfield regarded as "doubtful" the claim that the "subject to" language should be "treated as an incorporation by reference," *id.* at 201, but in any event rejected the shipowner's motion for a stay pending arbitration:

> The arbitration clause, as its terms expressly and unequivocally provide, was limited to the parties to the charter party, Jordan and Federal, and to arbitration of any disputes that might arise between "the Owners" (Federal) and "the Charterers" (Jordan), not to disputes with third parties, such as the shipper or consignee of goods. Plaintiff is neither an Owner nor a Charterer of the ship and the dispute it presents is not one "between the Owners and Charterers." Federal's attempt to expand the arbitra-

tion clause beyond its plain meaning not only violates fundamental contract principles but ignores the plain and limited language used by the parties. *Id.* at 201–02.

Under the rationale of these cases, plaintiffs at bar cannot be compelled to arbitrate because the arbitration clause in the FRA is limited to the direct insurers and English reinsurers who were parties to that agreement. Plaintiffs are non-parties, and a phrase like "subject to" is not sufficient to bind them to the arbitration clause.

Seeing to avoid the impact of this authority, RNV argues in its reply brief at 26 n. 11 that the cases deal with "one specialized factual situation—where a charter party that includes an arbitration provision is incorporated by reference into a bill of lading." According to RNV, the cases articulate "special" rules, which RNV says have never been imposed "to defeat arbitration outside that factual context." Furthermore, RNV argues, the cases "were decided under federal admiralty law" (that notorious source of jurisprudential aberrations), and have not been applied "in any case decided under New York law."

I do not agree that the cited cases can be so limited or distinguished. Judge Mansfield correctly observed in *Production Steel* that the issue involves "fundamental contract principles," the particular principle being that arbitration is consensual. The Second Circuit has not limited this analysis to bill of lading cases; *Nereus* turned upon the proper construction of a long-term contract of charter party. Furthermore, the Second Circuit employed the same analysis in *Continental Group, supra,* construing New York law. The Second Circuit said of the underlying contract at 873 F.2d 613 n. 3:

> This language, when viewed in context, falls far short of that "express, unequivocal agreement" by Corp. to arbitrate its obligations as guarantor that New York law requires. *Marlene Industries Corp. supra.* The "parties" embraced by paragraph 6 are identified in its first sentence: the "manager", i.e. Communications, and CGI. Paragraph 6 goes on to vest Communications and CGI (but not

Corp.) with the power to request arbitration and agree upon the arbitrator; it casts arbitration expenses "equally" upon Communications and CGI (not Corp.). The preamble to the agreement recites that it is between CGI and Communications. An agreement by Corp. to arbitrate its obligations under the guarantee cannot be fashioned out of such stuff as this.

While this discussion may be regarded as dictum, it is consistent with the requirement, in both federal and New York law, that a party's agreement to arbitrate be express and unequivocal.

Finding no such agreement binding upon plaintiffs in the case at bar, I deny RNV's petition to compel arbitration and grant plaintiffs' cross-motion to enjoin it.[4]

RNV's motion to compel arbitration is denied. Plaintiff's cross-motion to enjoin arbitration is granted. The case will be litigated in this Court. An initial scheduling order will be entered concurrently herewith.

It is SO ORDERED.

---

4. This conclusion makes it unnecessary to consider plaintiffs' final argument, which is that the arbitration clause does not cover the disputes between RNV and the plaintiffs with respect to the two casualty claims. While on this aspect of the case RNV may properly rely upon public policy favoring arbitration as a form of alternate dispute resolution, nevertheless RNV's proposition seems doubtful, since the arbitration clause is limited to disputes "concerning the interpretation of this Reinsurance Agreement ..." I think it something of a stretch to say that disputes under the 1977 FRA (between direct insurers and reinsurers) include disputes between reinsurers and retroceded reinsurers arising out of a 1989 policy. But the basis for decision is on the ground stated in the text.