991 F.2d 42
 1993 A.M.C. 2916
 PROGRESSIVE CASUALTY INSURANCE CO.; the Reinsurance
Corporation of New York; Christiania General Insurance
Corporation of New York; Worcester Insurance Company;
Pennsylvania Lumbermens Mutual Insurance Company; Colonia
Insurance Company; United Reinsurance Corporation of New
York; United Fire and Casualty Company, Plaintiffs-Appellees,
v.
C.A. REASEGURADORA NACIONAL DE VENEZUELA, Defendant-Appellant.
 No. 968, Docket 92-9198.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 25, 1993.
Decided April 6, 1993.
 
 James W. Carbin, New York City (Kroll & Tract, of counsel), for plaintiffs-appellees.
 Alexander Ewing, New York City (Debevoise & Plimpton, David W. Rivkin, Donald Francis Donovan, L. Ashley Lyu, of counsel), for defendant-appellant.
 Before: LUMBARD, McLAUGHLIN, Circuit Judges, and DUFFY, District Judge.*
 LUMBARD, Circuit Judge:
 
 
 1
 C.A. Reaseguradora Nacional De Venezuela ("RNV") appeals from an order entered on October 2, 1992 in the Southern District of New York, Haight, J., denying RNV's motion to stay this action pending arbitration and granting a motion to enjoin arbitration brought by Progressive Casualty Insurance Co., The Reinsurance Corporation of New York, Christiania General Insurance Corporation of New York, Worcester Insurance Company, Pennsylvania Lumbermens Mutual Insurance Company, Colonia Insurance Company, United Reinsurance Corporation of New York, and United Fire and Casualty Company (collectively "the American Reinsurers").[1] Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 802 F.Supp. 1069 (S.D.N.Y.1992).
 
 
 2
 RNV contends that the district court erred in ruling that: (1) RNV is required to show an "express, unequivocal" agreement to arbitrate; (2) a trial is necessary to determine whether the parties' agreement incorporated by reference an arbitration clause contained in another document; and (3) the arbitration clause does not bind the American Reinsurers as a matter of law. We reverse and remand.
 
 
 3
 In the early 1980s, a group of Venezuelan insurance companies issued insurance to a subsidiary of Petroleos de Venezuela, S.A. ("PDVSA"), an oil and gas exploration and development company owned by the Venezuelan government. Among other things, the insurance covered the costs of controlling oil wells following a "surface blowout." The Venezuelan insurers reinsured $10 million of this "cost of control" risk with RNV. RNV in turn retroceded, or re-reinsured, this risk through Sedgwick Marine & Cargo Ltd., a London based broker. Sedgwick placed 90 percent of the retroceded risk with London based reinsurers, and Fred S. James & Co., Sedgwick's American affiliate, placed the remaining 10 percent with New York Marine Managers, Inc. ("NYMM"),[2] the underwriting agent for the American Reinsurers.
 
 
 4
 Thus, beginning in 1983, RNV and the American Reinsurers entered into a series of one-year retrocession agreements. Each year, James or Sedgwick discussed terms of coverage with NYMM and, on the basis of those discussions, presented NYMM with an insurance application which broadly outlined the agreed upon terms.[3] As is the industry practice, the policy was then prepared and sent by James or Sedgwick to NYMM for signature.
 
 
 5
 The parties' dispute arises from their agreement for 1989. NYMM signed the application for that year's coverage on behalf of the American Reinsurers on February 16, 1988. The Policy for 1989 was signed on August 31, 1988. Of particular relevance here, one provision of the Policy states, "Subject to Facultative Reinsurance Agreement."
 
 
 6
 RNV contends that the Facultative Reinsurance Agreement[4] ("FRA") referred to in the Policy is a 1977 agreement between certain insurers, reinsurers, and Lloyd's of London underwriters applicable to the reinsurance of PDVSA risk. The FRA establishes administrative procedures, provides for letters of credit, and contains an arbitration clause, which states in part:
 
 
 7
 Any question or dispute arising between the contracting parties concerning the interpretation of this Reinsurance Agreement, which cannot be otherwise arranged shall be settled by arbitration in London, England.
 
 
 8
 At issue here are two claims submitted by RNV under the Policy: an August 8, 1989 claim for a "blowout" at the CARI-6 drill site, and an October 23, 1989 claim for a "blowout" of the TEJERO 2E well. In June 1990, NYMM, on behalf of the American Reinsurers, paid RNV $1 million to cover the CARI-6 claim. In December 1990, however, NYMM rejected RNV's TEJERO 2E claim and notified Sedgwick that the $1 million had been paid in error because the CARI-6 claim was not covered by the Policy.
 
 
 9
 On July 8, 1991, the American Reinsurers filed this action seeking a declaration that RNV's claims were not covered by the Policy and requesting repayment of $1 million. On October 16, 1991, RNV served the American Reinsurers with a demand for arbitration. RNV then moved in the district court, pursuant to 9 U.S.C. §§ 3, 201, and 206 (1988), for a stay of this action and an order directing that arbitration be held. The American Reinsurers cross-moved to enjoin RNV from proceeding with the arbitration. The district court denied RNV's motion and granted the American Reinsurers' cross-motion. This appeal followed.
 
 
 10
 Federal policy, as embodied in the Federal Arbitration Act,[5] strongly favors arbitration as an alternative dispute resolution process. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 480-81, 109 S.Ct. 1917, 1919-20, 104 L.Ed.2d 526 (1989); Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Arbitration Act provides that written arbitration provisions in any contract involving interstate or international commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1988). Thus, where a court is satisfied that a dispute before it is arbitrable, it must stay proceedings and order the parties to proceed to arbitration. Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir.1987) (citing 9 U.S.C. §§ 3-4 (1988)).
 
 
 11
 In determining the arbitrability of a particular dispute, a court must decide "whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims." David L. Threlkeld & Co. v. Metallgesellschaft, Ltd., 923 F.2d 245, 249 (2d Cir.), cert. dismissed, --- U.S. ----, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991). We address these questions in turn.
 
 A. Agreement to Arbitrate
 
 12
 Perry v. Thomas, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), dictates that we apply state law in determining whether the parties have agreed to arbitrate. In Perry, addressing the preemptive effect of § 2 of the Arbitration Act, the Court stated:
 
 
 13
 An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). Thus state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.
 
 
 14
 Id. at 492 n. 9, 107 S.Ct. at 2527 n. 9 (citations omitted). Thus, while § 2 of the Arbitration Act preempts state law which treats arbitration agreements differently from any other contracts, it also "preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." Cook Chocolate Co. v. Salomon, Inc., 684 F.Supp. 1177, 1182 (S.D.N.Y.1988).
 
 
 15
 We agree with the district court that New York law governs here.[6] That law provides that parties will not be held to have chosen arbitration "in the absence of an express, unequivocal agreement to that effect." Marlene Indus. Corp. v. Carnac Textiles, Inc., 45 N.Y.2d 327, 408 N.Y.S.2d 410, 413, 380 N.E.2d 239, 242 (1978) (quoting Acting Superintendent of Schs. of Liverpool Cent. Sch. Dist. v. United Liverpool Faculty Ass'n, 42 N.Y.2d 509, 399 N.Y.S.2d 189, 191, 369 N.E.2d 746, 748 (1977)). However, New York law requires that nonarbitration agreements be proven only by a mere preponderance of the evidence. See, e.g., Fleming v. Ponziani, 24 N.Y.2d 105, 299 N.Y.S.2d 134, 139, 247 N.E.2d 114, 118 (1969). Because Perry prohibits such discriminatory treatment of arbitration agreements, the rule set forth in Marlene Industries is preempted. Accordingly, in determining whether the parties have agreed to arbitrate, we apply the ordinary preponderance of the evidence standard.
 
 
 16
 We believe that the parties agreed to arbitrate by incorporating the FRA into the Policy. We do not believe a trial is necessary to determine whether the parties intended the Policy to include the term referring to the FRA. There is no dispute that the Policy states, "Subject to Facultative Reinsurance Agreement," that NYMM signed the Policy on behalf of the American Reinsurers, and that the parties intended the Policy to be the final and binding expression of their agreement. Under New York law, in the absence of fraud or other wrongful conduct, a party who signs a written contract is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions. Level Export Corp. v. Wolz, Aiken & Co., 305 N.Y. 82, 87, 111 N.E.2d 218 (1953).
 
 
 17
 We reject the American Reinsurers' contention that they are entitled to reformation of the Policy on grounds of fraud or mutual mistake. Proof of fraud requires a showing of either an affirmative misrepresentation of a material fact, see Barclay Arms, Inc. v. Barclay Arms Assocs., 74 N.Y.2d 644, 542 N.Y.S.2d 512, 514, 540 N.E.2d 707, 709 (1989), or an omission of a material fact coupled with a duty of disclosure. See Aaron Ferer & Sons v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir.1984) (applying New York law). The term referring to the FRA appears plainly in the Policy, and there has been no showing that RNV or its broker misrepresented or concealed its inclusion. Furthermore, to establish mutual mistake, a party must prove that both parties to the agreement intended something other than that which was memorialized. Investors Ins. Co. of America v. Dorinco Reinsurance Co., 917 F.2d 100, 105 (2d Cir.1990) (applying New York law). This has not been shown, as it is uncontroverted that RNV, through its broker, intended to include the term referring to the FRA. We therefore conclude that the American Reinsurers are bound to all Policy terms, including the term referring to the FRA.[7]
 
 
 18
 We also disagree with the district court's ruling that a trial is necessary to determine whether the Policy identified the FRA with sufficient specificity to incorporate it by reference into the Policy. The Policy specifically and directly identifies the FRA by name. The use of capitalized letters in the phrase "Subject to Facultative Reinsurance Agreement" indicates to any reasonable person that a specific document is being referenced. If NYMM was unfamiliar with the FRA, it should either have asked Sedgwick or James, or objected to the provision before signing the Policy. Having failed to do so, NYMM, as a very sophisticated party, is deemed as a matter of law to have understood and agreed to all aspects of the Policy. See Level Export, 305 N.Y. at 87, 111 N.E.2d 218.[8]
 
 
 19
 Finally, the FRA's arbitration clause is not so restrictively worded that it does not bind the American Reinsurers as a matter of law. As the district court recognized, we have held that "an arbitration agreement restricted to the immediate parties does not bind a non-party, notwithstanding words of incorporation or reference in a separate contract by which that non-party is bound." Progressive Cas., 802 F.Supp. at 1079 (collecting cases). For example, in Import Export Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503 (2d Cir.1965), we refused to compel arbitration on the basis of a charter party clause which provided for arbitration of disputes "between the Disponent Owners and the Charterers," even though the charter party had been incorporated by reference into a bill of lading. We reasoned that "[i]t would be unduly stretching the language of this arbitration clause to say that [a non-party] is one of the 'Disponent Owners' or 'Charterers.' " Id. at 506. Accord Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A., 658 F.Supp. 809, 814-16 (S.D.N.Y.1987); General Authority for Supply Commodities v. S.S. Capetan Costis I, 631 F.Supp. 1488, 1489 (S.D.N.Y.1986); Production Steel Co. v. S.S. Francois L.D., 294 F.Supp. 200, 201-02 (S.D.N.Y.1968).
 
 
 20
 On the other hand, we have held that a broadly-worded arbitration clause which is not restricted to the immediate parties may be effectively incorporated by reference into another agreement. In Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A., 527 F.2d 966, 973 (2d Cir.1975), cert. denied, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976), we ruled that a clause in a charter party which provided for arbitration of "any and all differences and disputes of whatsoever nature arising out of this Charter" was binding on parties to a bill of lading which incorporated the charter party by reference. Accord Lowry & Co. v. S.S. Le Moyne D'Iberville, 253 F.Supp. 396, 398 (S.D.N.Y.1966), appeal dismissed, 372 F.2d 123 (2d Cir.1967); Lowry & Co. v. S.S. Nadir, 223 F.Supp. 871 (S.D.N.Y.1963).
 
 
 21
 Like the clause in Nereus Shipping, we believe the FRA's arbitration clause is worded broadly enough to allow its effective incorporation by reference into other contracts. Unlike the clause in Import Export, the FRA's clause is not restrictively worded by referring to the immediate parties to that contract by name. Rather, the FRA merely provides for arbitration of disputes between "the contracting parties." We do not think it would be "unduly stretching" the language of the clause to term the American Reinsurers and RNV "contracting parties."
 
 B. Scope of the Arbitration Agreement
 
 22
 The issue of an arbitration agreement's scope is governed by "the federal substantive law of arbitrability," which counsels:
 
 
 23
 that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself, or an allegation of waiver, delay, or a like defense to arbitrability.
 
 
 24
 Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985) (quoting Moses H. Cone, 460 U.S. at 24-25, 103 S.Ct. at 941-42). "Indeed, unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should be submitted to arbitration." Concourse Village, Inc. v. Local 32E, Service Employees Int'l Union, 822 F.2d 302, 304 (2d Cir.1987) (quoting United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960)).
 
 
 25
 The American Reinsurers contend that because the FRA's arbitration clause refers to disputes "concerning the interpretation of this Reinsurance Agreement," the clause applies only to disputes concerning the FRA, even where the clause has been incorporated into another agreement. This argument is plainly inconsistent with prior case law in which we have applied arbitration clauses using similar language to disputes arising out of other agreements into which they have been incorporated by reference.[9] See, e.g., S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 192, 195-96 (2d Cir.1984) (arbitration clauses referred to "this Agreement" or "this Contract"); Nereus Shipping, 527 F.2d at 969 (arbitration clause referred to "this Charter").
 
 
 26
 We have reviewed the American Reinsurer's other arguments and find them without merit.
 
 
 27
 We reverse and remand to the district court with directions to stay this action pending arbitration and to order the parties to proceed to arbitration.
 
 
 
 *
 Hon. Kevin Thomas Duffy, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1) (1988) and 9 U.S.C. § 16(a)(1)(A), (C), and (a)(2) (1988 and Supp. III 1991)
 
 
 [2]
 NYMM is now known as Somerset Marine, Inc
 
 
 [3]
 An insurance application is also known as a "binder" or "slip." See Employers Commercial Union Ins. Co. v. Firemen's Fund Ins. Co., 45 N.Y.2d 608, 412 N.Y.S.2d 121, 124, 384 N.E.2d 668, 670 (1978) (describing binder as a "quick and informal device to record the giving of protection pending the execution and delivery of a more conventionally detailed policy of insurance")
 
 
 [4]
 "Facultative reinsurance" is a form of reinsurance which "involves the offer of a portion of a particular risk to one or more potential reinsurers, who are then free to accept or reject the risk in whole or in part." Christiana Gen. Ins. Corp. v. Great Am. Ins. Co., 745 F.Supp. 150, 152 (S.D.N.Y.1990) (quoting Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsurance Co., 75 N.Y.2d 295, 552 N.Y.S.2d 891, 894, 552 N.E.2d 139, 142 (1990) (footnote omitted)). It is distinguishable from "treaty reinsurance," which "involves an ongoing agreement between two insurance companies binding one in advance to cede and the other to accept certain reinsurance business pursuant to its provisions." Id
 
 
 [5]
 See 9 U.S.C. §§ 1-16, 201-207, 301-307 (1988 and Supp. III 1991)
 
 
 [6]
 As a federal court sitting in a diversity case, we must apply the choice of law rules of the state in which the action was brought. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New York courts apply an "interest analysis" to choice of law issues involving contractual disputes, and therefore, "the law of the jurisdiction having the greatest interest in the litigation will be applied." Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 581 (1969) (quoting Miller v. Miller, 22 N.Y.2d 12, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968)). The domicile of the parties provides no conclusive guide. RNV is Venezuelan, four of the American Reinsurers have principal places of business in New York, and the remaining four have principal places of business in other states. However, both NYMM and James are domiciled in New York, the Policy was signed there, and obligations under the Policy must be satisfied upon presentation of a claim to NYMM in New York. See Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co., 887 F.2d 437, 439 (2d Cir.1989) (applying "interest analysis" to determine law governing reinsurance policy). We therefore conclude that New York is the jurisdiction with the greatest interest in this matter
 
 
 [7]
 We believe the district court's reliance on Employers Commercial Union was misplaced. There, the court addressed the situation where an accident occurred after the insured had obtained an insurance binder, but before a policy was signed. The court ruled that coverage was triggered by the binder, and "usual" terms would be implied into the binder, and, by implication, "unusual" terms would not. 412 N.Y.S.2d at 124, 384 N.E.2d at 670. The district court interpreted this ruling to mean that because the Policy term referring to the FRA was not mentioned in the application, it can be a part of the Policy only if it is a "usual" reinsurance policy term. C.A. Reaseguradora, 802 F.Supp. at 1076
 Employers Commercial Union is irrelevant here because, by its terms, it governs only where no policy exists. The parties signed the Policy well before the incidents which allegedly triggered coverage. The application is therefore of no legal effect. See Di Costanzo v. Allstate Ins. Co., 68 A.D.2d 834, 414 N.Y.S.2d 517, 518 (1st Dep't 1979) (policy expresses "final understanding" between insurer and insured), aff'd 50 N.Y.2d 832, 430 N.Y.S.2d 51, 407 N.E.2d 1347 (1980).
 
 
 [8]
 We think Chiacchia v. National Westminster Bank, 124 A.D.2d 626, 507 N.Y.S.2d 888 (2d Dep't 1986), upon which the district court relied, is plainly distinguishable. There, the defendant bank argued that a document entitled "Rules for Your Safety Deposit Box Service" was incorporated into a safety deposit box rental agreement by a reference to the "rules and regulations of the bank in force at this date." The court ruled that a trial was necessary to determine whether this phrase identified the "Rules" document with sufficient specificity to incorporate it by reference. Id. 507 N.Y.S.2d at 889-90. Here, by contrast, RNV does not rely on a vague allusion to an entire class of documents, but rather on a specific reference to a single document directly identified by name
 
 
 [9]
 Were we to accept the American Reinsurers' position, it would be almost impossible to incorporate any arbitration clause into a second agreement. A standard clause such as "All disputes arising out of this agreement shall be arbitrated" could not be incorporated because "this agreement" would be held to refer only to the original agreement containing the clause