Ariel FREANER, Plaintiff,

v.

Enrique Martin Lutteroth VALLE, an individual; Hotelera Coral, S.A. de C.V., a stock company of Baja California, Republic of Mexico; and Does 1 to 10, Defendants.

Case No. 11CV1819 JLS (MDD).

United States District Court, S.D. California.

Aug. 22, 2013.

Frederick M. Reich, Law Offices of James J. Warner, San Diego, CA, for Plaintiff.

Margarita Haugaard, Horton Knox Carter and Foote, San Diego, CA, Orlando Bailey Foote, III, Horton Knox Carter and Foote LLP, El Centro, CA, for Defendants.

**ORDER (1) DENYING MOTION TO COMPEL ARBITRATION; (2) GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT; AND, (3) SETTING DEADLINE FOR COMPLETION OF PENDING ARBITRATION PROCEEDINGS**

JANIS L. SAMMARTINO, District Judge.

Presently before the Court is Plaintiff Ariel Freaner's ("Plaintiff," or "Freaner") Motion to Compel Arbitration of the 2009 Contract, (Mot. Compel Arbit., ECF No. 82), as well as Defendants Enrique Martin Lutteroth Valle ("Valle") and Hotelera Coral, S.A. de C.V.'s ("Hotelera Coral," and collectively, "Defendants") response in opposition, (Resp. in Opp'n, ECF No. 85), and Freaner's reply in support, (Reply in Supp., ECF No. 86). The hearing on the motion set for March 22, 2013 was vacated and the matter was taken under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).

Also before the Court is Defendants' Motion for Partial Summary Judgment, or Alternatively, for an Order Treating Specified Facts as Established, on Hotelera Coral's Counterclaim, (Mot. Partial Summ. J., ECF No. 64), along with Freaner's response in opposition, (Resp. in Opp'n, ECF No. 69), and Defendants' reply in support, (Reply in Supp., ECF No. 72). A hearing on the motion was held on January 31, 2013, at which time the Court took the motion under submission pending the filing and expedited briefing of Freaner's motion to compel arbitration.

Having considered the parties' arguments and the law, the Court (1) **DENIES** Freaner's motion to compel arbitration, (2) **GRANTS IN PART AND DENIES IN PART** Defendants' motion for partial summary judgment on their counterclaim, and (3) **SETS** a deadline of October 31, 2013 for the completion of all pending arbitration proceedings.

## BACKGROUND

### 1. Factual Background

The Court has issued two prior Orders in this case that discuss the relationship between Freaner and Hotelera Coral and the breakdown of communication between the parties that preceded the filing of this suit. (*See* Order, Nov. 17, 2011, ECF No. 23, 2011 WL 5596919; Order, Feb. 6, 2013, ECF No. 81). This Order incorporates by reference the facts as set forth in those prior Orders. The most pertinent facts are set forth here once again to provide necessary context for the issues discussed below.

This case arises out of a contract dispute between Freaner, a graphic and web designer in San Diego, California, and Hotelera Coral, a resort hotel located in Baja California, Mexico. On June 23, 2008, the parties entered into a Service Agreement, memorialized in a signed, printed contract, pursuant to which Freaner was to provide marketing services and products to Hotelera Coral, including, among other things, design and development of a new web site, development of advertising concepts and strategies, and design and production of print advertising materials. Hotelera Coral was to pay $76,592 to Freaner in six installments.

The June 2008 Service Agreement includes a provision requiring Hotelera Coral to pay Freaner an hourly rate for pro-

jects or tasks outside the scope of the contract. The provision reads as follows:

c. Any projects or tasks outside the scope of this Agreement will be billed as follows:

i. $250 (two hundred fifty U.S. dollars) per hour for design and creative services

ii. $150 (one hundred fifty U.S. dollars) per hour for production services.

d. Clients will not be obligated to pay for any project outside the scope of this Agreement unless previously approved in writing.

The June 2008 Service Agreement also includes a provision requiring the parties to settle their disputes through binding arbitration. The arbitral clause reads as follows:

**Arbitration.** Any controversy or claim arising out of or related to this Agreement, or breach thereof, shall be submitted to and resolved by binding arbitration. The arbitration will be conducted in San Diego, California by a single neutral arbitrator and in accordance with the then current rules of the American Arbitration Association. The arbitrator shall have the power to enter any award that could be entered by a judge of the trial court of the State of California, and only such power, and shall follow the law. The parties agree to abide by and perform any award rendered by the arbitrator. The arbitrator shall issue the award in writing and therein shall state the essential findings and conclusions on which the award is based. Judgment on the award may be entered in any court having jurisdiction thereof.

In the Spring of 2009, the parties began negotiating another contract. Freaner initiated the negotiations by sending Defendants a document marked as a proposal, which set forth two alternatives. Defendants reviewed the proposal and the par-ties subsequently agreed on the first alternative, pursuant to which Freaner would provide specified design and creative services in exchange for $4,000 per month from Hotelera Coral for a 12–month term.

Freaner then sent Defendants a printed contract that incorporated the terms that the parties had discussed. This printed contract contained the same arbitral clause as the June 2008 Service Agreement.

The parties disagree as to the events that followed, as discussed more extensively below. It is undisputed, however, that Defendants never signed the printed contract. It is also undisputed that Defendants began paying Freaner $4,000 per month beginning in July 2009 and that Freaner began providing services as specified in the printed contract.

Around May 2010, Defendants became upset because Freaner failed to deliver print advertising materials that Defendants had requested, and paid for, months earlier. The relationship between the parties broke down shortly thereafter and their agreement was not renewed for the following year.

On March 31, 2011, Freaner sent Defendants a letter demanding compensation for numerous services that he allegedly rendered between June 2008 and October 2010. Freaner alleged that he was entitled to $174,080 in unpaid compensation.

**2. Procedural Background**

On June 17, 2011, Freaner filed suit for breach of contract in the Superior Court of the State of California for the County of San Diego. In his complaint, he alleged breach of the June 2008 Service Agreement and sought damages in excess of $170,000.

On August 15, 2011, Defendants filed a motion to compel arbitration of Freaner's

breach of contract claim. On the same day, Defendants also removed the action to this Court, invoking the Inter–American Convention on International Commercial Arbitration, also known as the Panama Convention, and its implementing legislation, 9 U.S.C. §§ 301–307.

On September 2, 2011, Defendants filed a counterclaim for breach of contract, alleging that Freaner breached the parties' 2009 agreement. On the same day, Freaner filed a motion to compel arbitration of the June 2008 Service Agreement. On September 13, 2011, Freaner filed a motion to remand the action back to Superior Court. On September 27, 2011, Freaner filed an answer to Defendants' counterclaim.

On November 17, 2011, the Court denied Freaner's motion to remand because this action is related to an arbitration agreement falling under the Panama Convention, such that removal was proper under 9 U.S.C. § 205, which is incorporated by reference in cases falling under the Panama Convention by 9 U.S.C. § 302. (Order, Nov. 17, 2011, ECF No. 23). The Court granted the parties' motions to compel arbitration because the June 2008 Service Agreement contains a binding arbitration clause. (*Id.*) The Court directed the parties to arbitrate their dispute with the American Arbitration Association ("AAA") and to follow its rules to select an arbitrator. (*Id.*) The Court stated that it would be "premature to consider whether to compel arbitration of issues related to the 2009 contract that are the subject of Hotelera Coral's counterclaims as the Court is not yet faced with a motion to compel arbitration of those claims." (*Id.*)

After Magistrate Judge Dembin vacated a previously scheduled Early Neutral Evaluation on January 3, 2012, Defendants proceeded to file an Ex Parte Application for Order Reinstating Scheduling of an Early Neutral Evaluation Conference. The Magistrate Judge granted Defendants' motion on the ground that only Freaner's breach of contract claim had been referred to arbitration and that Defendants' counterclaim remained before the Court and was ready to proceed to the next stage of litigation. An Early Neutral Evaluation and a Case Management Conference were subsequently held on February 23, 2012 before the Magistrate Judge.

Freaner had not commenced arbitration proceedings by the time the Magistrate Judge held these hearings. Thus, on February 24, 2012, the Magistrate Judge ordered Freaner to commence arbitration by March 8, 2012. Freaner requested additional time to raise funds to pay the AAA's initial filing fee and the Magistrate Judge subsequently extended the deadline to March 22, 2012. On March 26, 2012, this Court issued an Order to Show Cause Why Sanctions Should Not Be Imposed, requiring Freaner to explain why he had yet to commence arbitration by the generous deadline set by the Magistrate Judge.

On April 9, 2012, Freaner filed a declaration with the Court indicating that he had complied with the Magistrate Judge's Order, albeit in an untimely manner, by commencing arbitration on March 23, 2012. On that day, Freaner filed an arbitral demand with the AAA's International Centre for Dispute Resolution ("ICDR"). Freaner's arbitral demand sought relief under the June 2008 Service Agreement and under the unsigned, printed contract that Freaner sent to Defendants in 2009.

On April 16, 2012, the Magistrate Judge issued a scheduling order setting a timetable for discovery and a cutoff date for the filing of dispositive motions. The parties subsequently filed several motions regarding the adequacy of Freaner's responses to discovery requests. These motions were addressed by the Magistrate Judge.

On September 24, 2012, Freaner submitted a notice regarding the status of the arbitration proceedings. Freaner explained that he was unable to pay the ICDR's $2,500 proceed fee due to a lack of funds and that consequently the ICDR administratively closed the arbitral proceedings on July 17, 2012. Freaner also explained that he re-filed his arbitral demand with the ICDR on August 21, 2012. On the same day, Defendants filed a separate notice with the Court stating that they had not received any communications from ICDR regarding Freaner's renewed arbitral demand.

On October 9, 2012, Defendants filed a motion challenging the arbitrator's jurisdiction over the dispute. Although Defendants styled their motion as one for summary judgment, Defendants sought, in effect, an interlocutory ruling on the arbitrator's jurisdiction that might have been raised in a motion for an anti-arbitration injunction or declaration. *See* S.I. Strong, *International Commercial Arbitration: A Guide for Judges* 44 (2012). In their motion, Defendants requested that the Court issue an Order to Show Cause as to why judgment should not be entered against Freaner on his breach of contract claim due to his delay in commencing arbitration. Defendants also sought a ruling from the Court declaring that the arbitrator lacked jurisdiction to award compensation for services rendered by Freaner after the termination of the June 2008 Service Agreement. Finally, Defendants sought a ruling from the Court declaring that the arbitrator lacked jurisdiction over any claims arising under the 2009 agreement.

On the same day, Defendants also filed a motion for partial summary judgment on their breach of contract counterclaim. Freaner opposed this motion on the merits and Defendants filed a reply in support.

The Court held a hearing on Defendants' motions on January 31, 2013 and issued an Order shortly thereafter. (Order, Feb. 6, 2013, ECF No. 81). The Court determined that Freaner's delay in commencing arbitration was not so lengthy as to require a dismissal of his breach of contract claim, but concluded that a deadline for the completion of arbitral proceedings should be set in light of the substantial risk of prejudice to Defendants from continued delays. (*Id.*) The Court further concluded that the arbitrator should resolve the issue of the extent of his jurisdiction under the June 2008 Service Agreement. (*Id.*) Finally, the Court determined that further briefing would be required regarding the arbitrator's jurisdiction over the 2009 contract dispute. (*Id.*)

The Court set an expedited briefing schedule for Freaner to file a motion to compel arbitration of the 2009 contract dispute and Defendants to file an opposition. The Court reserved ruling on Defendants' partial summary judgment motion until the arbitrator's jurisdiction over the 2009 dispute could be ascertained.

Freaner filed his motion to compel arbitration on February 15, 2013. Defendants filed a response in opposition on March 4, 2013, and Freaner filed a reply in support on March 11, 2013. As indicated above, the Court vacated the motion hearing and took the matter under submission on March 18, 2013.

## MOTION TO COMPEL ARBITRATION

### 1. Standard of Review

#### A. *Applicability of the Inter–American Convention on International Commercial Arbitration*

■ The arbitration clause invoked by Freaner in this action is governed by the

Inter–American Convention on International Commercial Arbitration, also known as the Panama Convention. The Panama Convention is an international treaty that provides a regional framework for ensuring that national courts recognize and enforce arbitration agreements and arbitral awards relating to international commercial transactions.

The Panama Convention was originally promulgated on January 30, 1975 and signed by the United States on June 9, 1978. The United States subsequently ratified the Convention on October 9, 1986 and legislation implementing the Convention, now codified as Chapter 3 of the FAA, 9 U.S.C. §§ 301–307, was signed into law on August 15, 1990. The U.S. deposited the ratified treaty with the Organization of American States ("OAS") on September 27, 1990, and the Convention went into force 30 days later, on October 27, 1990.

■ The Panama Convention is based, in large part, on the more widely known United Nations Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958, also known as the New York Convention. The New York Convention was implemented by legislation now codified at Chapter 2 of the FAA, 9 U.S.C. §§ 201–208. The two Conventions share many of the same features and characteristics and Congress has even indicated that the two Conventions are "intended to achieve the same results." *See Energy Transp., Ltd. v. M.V. San Sebastian,* 348 F.Supp.2d 186, 198 (S.D.N.Y.2004) (quoting H.R.Rep. No. 101–501, at 4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 675, 678). The legislation implementing the Panama Convention incorporates by reference several crucial provisions of the legislation implementing the New York Convention, further demonstrating the close relationship between the two Conventions. *See* 9

U.S.C. § 302 (incorporating by reference §§ 202, 203, 204, 205, and 207).

Although the text of the Panama Convention is largely silent as to the Convention's field of application, this omission is addressed by the implementing legislation. Section 202, incorporated by reference by virtue of Section 302, provides, in relevant part:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial ... falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

This broad definition suggests that most arbitration agreements and arbitral awards relating to international commercial transactions will fall under either the New York or Panama Conventions.

Notwithstanding Section 202's expansive definition, the Panama Convention applies only to the field of "international" commercial arbitration. This limit is made explicit in the Convention's title and preamble. The "internationality" requirement distinguishes the Panama Convention from the New York Convention, which applies to the arguably broader category of "foreign arbitral awards." *See* John P. Bowman, *The Panama Convention and its Implementation under the Federal Arbitration Act,* 33–37 (2002); Albert Jan van den Berg, *The New York Convention 1958 and Panama Convention 1975: Redundancy or Compatability?* 5 Arb. Int'l 214, 218–20 (1989). Chapter 3 appears to expand the field of application of the Panama Con-

vention "beyond its prescribed boundaries. . . ." *See* Bowman, *supra,* at 67.

Furthermore, Section 304 indicates that an arbitral award will only be recognized and enforced under the Panama Convention if the award was rendered in a State that has acceded to the Convention. This provision suggests that U.S. courts should also refuse to apply the Convention to arbitration agreements that require arbitration to take place within a State that has not acceded to the Convention. *See* Bowman, *supra,* at 67–69.

■ Chapter 3 also prescribes the method for determining which Convention applies when the requirements for application of both Conventions are met. Section 305 provides that the Panama Convention must apply if "a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the Panama Convention and are member States of the Organization of American States. . . ." In all other cases, Section 305 indicates that the New York Convention must govern.

■ Here, the alleged arbitration agreement consists of an arbitral clause in a printed contract for design and advertising services between Freaner, a citizen of the United States, and Valle, a citizen of Mexico, as well as Hotelera Coral, an entity incorporated under the laws of Baja California, Mexico. Thus, the arbitration agreement falls under the Panama Convention because (1) it evidences a transaction that is both international and commercial in nature, (2) it does not arise out of a relationship that is entirely between citizens of the United States or, alternatively, it has a reasonable relation to a foreign state, namely, Mexico, (3) it designates the seat of the arbitration as San Diego, California, which lies within the United States, a nation that has acceded to the Convention, and (4) all parties to the agreement are citizens of States that have acceded to the Convention and are member States of the OAS, namely, the United States and Mexico.

## B. Enforcement of Arbitration Agreements Falling Under the Panama Convention

The Panama Convention provides that arbitration agreements are presumptively valid. Article 1 of the Convention states: "An agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid."

The Convention is conspicuously silent, however, as to a court's duty or power to compel arbitration or to stay litigation pending an arbitral proceeding. *See* Bowman, *supra,* at 46–49. Similarly, the Convention does not enumerate any grounds upon which a court might refuse to enforce an arbitration agreement, nor does it specify any criteria upon which a court should rely in establishing the substantive validity of such an agreement. *See id.* at 50–51.

These "lacunae" in the Convention's text are largely addressed by the Convention's implementing legislation. *See* Gary B. Born, *International Commercial Arbitration* 105 n. 622 (2009) (quoting Albert Jan van den Berg, *The New York Arbitration Convention of 1958* 102 (1981)) ("[T]he Panama Convention shows a certain number of lacunae and obscurities in comparison with the New York Convention"); Bowman, *supra,* at 69–71. Section 303(a) explicitly authorizes courts to refer parties to arbitration in actions falling under the Panama Convention. Moreover, Section 307 requires the residual application of Chapter 1 of the FAA, the law governing domestic arbitration, so long as it does not conflict with Chapter 3 or with the Panama

Convention. *See, e.g., Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 45 (2d Cir.1994).

■ Accordingly, Section 2 of the FAA, which establishes the substantive validity of domestic arbitration agreements, also applies to arbitration agreements falling under the Panama Convention. *See Siderurgica Del Orinoco (Sidor), C.A. v. Linea Naviera De Cabotaje, C.A.*, No. 99 CIV 0075(TPG), 1999 WL 632870 at *5 (S.D.N.Y. Aug. 19, 1999); Bowman, *supra*, at 72, 146–47. Section 2 provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Moreover, the provisions of Chapter 1 establishing, or solidifying, a court's authority to stay litigation or compel arbitration are also applicable. *See* Strong, *Guide for Judges, supra*, at 37–49. For example, Section 3 of the FAA empowers a court to stay litigation pending arbitration once the court is "satisfied that the issue involved in [the] suit or proceeding is referable to arbitration under [an arbitration] agreement ... [and] the applicant for the stay is not in default in proceeding with ... arbitration."

Section 4 provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a court to compel the recalcitrant party to arbitrate the dispute. The court must "hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," direct the parties to "proceed to arbitration in accordance with ... the agreement." 9 U.S.C. § 4. If the making of an agreement to arbitrate is disputed, the court must "pro-

ceed summarily to the trial" of that issue. *Id.*

■ In resolving a motion to stay litigation or compel arbitration, however, a court may not review the merits of the dispute. Rather, a court's role is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.2000)).

## 2. Analysis

Freaner moves to compel arbitration of Defendants' counterclaim on the ground that the parties' agreement is embodied in a printed contract that includes a binding arbitration clause. Defendants resist arbitration and offer three arguments in support of their position: (1) The arbitral clause contained in the printed contract is invalid under the Panama Convention because the contract is not signed by both parties; (2) Freaner waived any right to invoke arbitration of this dispute by actively litigating the contract in this Court; and, (3) no agreement to arbitrate exists because Defendants did not consent to the printed contract and instead reached a separate oral agreement with Freaner that did not provide for arbitration.

### A. Proper Forum for Resolving Defendant's Jurisdictional Challenges

Freaner's position in this action is that any challenge to the arbitrator's jurisdiction over the dispute is for the arbitrator to resolve. (*See* January 31, 2013 Hearing Tr. 6–8, ECF No. 80). Defendants maintain, on the other hand, that the Court must determine whether the arbitrator has

jurisdiction.[1] (*See id.* at 12–13).

The proper forum for resolving disputes regarding an arbitrator's jurisdiction is typically a matter left to the agreement of the parties. *See Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 82–3, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). It is presumed, however, that parties have not agreed to arbitrate disputes regarding the existence or validity of an arbitration agreement.[2] *Howsam,* 537 U.S. at 83, 123 S.Ct. 588; *First Options,* 514 U.S. at 945, 115 S.Ct. 1920. This presumption may only be overcome by "clear and unmistakable" evidence. *First Options,* 514 U.S. at 945, 115 S.Ct. 1920.

The proper forum for resolving jurisdictional disputes also depends, in large part, on the type of jurisdictional challenge advanced by the party resisting arbitration. *See* Born, *supra,* at 363–80, 911–28, 938–48; William W. Park, *Determining an Arbitrator's Jurisdiction: Timing and Finality in American Law,* 8 Nev. L.J. 135, 148–152, 158–59 (2007). Arguments that challenge the validity or legality of a contract as a whole do not impeach a related arbitration clause and are typically considered appropriate for arbitral resolution. *See Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 449, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). Similarly, arguments that generally challenge *both* the contract as a whole *and* the arbitration clause should be initially determined by the arbitrator. *Id.* On the other hand, arguments that specifically challenge the validity or legality of the arbitration agreement, as distinguished from the contract as a whole, call into question the legitimacy of the arbitrator's role and so are presumptively for judicial determination. *See id.; First Options,* 514 U.S. at 943–44, 115 S.Ct. 1920.

Importantly, however, arguments that deny the very *existence* of a contract follow a different line of reasoning. *See Buckeye,* 546 U.S. at 444 n. 1, 126 S.Ct. 1204 ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."). Although such challenges are directed at both the contract and the arbitration clause, they are nonetheless unfit for arbitral resolution because it is "virtually impossible" to conceive how a party advancing such an argument could be said to have agreed to arbitrate the question of the arbitrator's jurisdiction. Born, *supra,* at 944–47. For this reason, a fundamental dispute regarding contract formation is presumptively for judicial resolution, absent other compelling reasons to allow the arbitrator to consider such a challenge. *See Sanford v. MemberWorks, Inc.,* 483 F.3d 956, 962 (9th Cir.2007) (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton*

---

1. Defendants also raised their jurisdictional objections with the arbitrator. Nonetheless, Defendants did not thereby acquiesce in an arbitral determination of the jurisdictional dispute. *See, e.g., First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 946, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.,* 377 F.3d 1164, 1171 (11th Cir.2004). Although the Court previously faulted Defendants for failing to object to the arbitration in a timely manner, it appears that Defendants have in fact done "virtually everything within [their] power to prevent the arbitration from going forward," at least with respect to any claims arising under the 2009 contract. *Four Seasons,* 377 F.3d at 1171 n. 5.

2. Arguably, this presumption should be reversed in the context of international business transactions, where arbitration is the principal method of dispute resolution. *See* Bowman, *supra,* at 131–37; *but see* Born, *supra,* at 958–60.

& Co., Inc., 925 F.2d 1136, 1140–41 (9th Cir.1991) ("Issues regarding the *validity* or *enforcement* of a putative contract mandating arbitration should be referred to an arbitrator, but challenges to the *existence* of a contract as a whole must be determined by the court prior to ordering arbitration.")); Born, *supra*, at 379 ("Where the existence of the underlying contract is challenged, then courts should presumptively decide the challenge. Nevertheless, if there are particular reasons of efficiency to prefer arbitration ... then [the presumption] may be rebutted.").

 Here, Defendants' challenges to the arbitrator's jurisdiction are all appropriate for judicial resolution. First, the Panama Convention appears to establish formal validity as a gateway issue that a court must decide prior to referring a matter to arbitration.[3] *See* Article 1 of the Panama Convention. Moreover, a challenge to the formal validity of an arbitration agreement is best characterized as a challenge directed specifically at the arbitration agreement, rather than at the contract as a whole. Such a challenge is therefore presumptively for resolution by the Court. *See Buckeye*, 546 U.S. at 449, 126 S.Ct. 1204.

 Second, although waiver of arbitration is a traditional contract defense that is presumptively for the arbitrator to resolve, *see Howsam*, 537 U.S. at 84, 123 S.Ct. 588, where waiver of the right to arbitrate turns on the significance of actions taken in a judicial forum, the matter

is best addressed by the Court.[4] *See Weight Watchers of Que. Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1057, 1059 (E.D.N.Y.1975) (citation omitted).

Third, Defendants' contention that there was no mutual assent to the printed contract challenges the very existence of the arbitration agreement that Freaner has invoked. Although this challenge impeaches both the contract and the arbitral clause, it should nonetheless be addressed by the Court because it calls into question the basis of the arbitrator's jurisdiction. *See Sanford*, 483 F.3d at 962. It would be unfair to compel Defendants to arbitrate a dispute over mutual assent to the contract because the implication of their argument is that they never agreed to arbitrate any issues at all.

Insofar as the allocation of competence to adjudicate jurisdictional disputes also turns on considerations of efficiency, fairness, and institutional fit, *see* Born, *supra*, at 378, these factors also favor judicial resolution in this instance. The arbitral proceedings were suspended at a very early stage in anticipation of a jurisdictional ruling from this Court. The matter has now been pending before this Court, in one shape or another, for many months. Refusing to address these jurisdictional challenges would only result in further delay. Accordingly, the Court proceeds to consider each of Defendants' challenges to the arbitrator's jurisdiction over Defendants' breach-of-contract counterclaim.

---

3. Article 1 of the Panama Convention is best understood as establishing a requirement of formal validity, not as a jurisdictional prerequisite or a limitation on the Convention's field of application. *See, e.g., Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 660 n. 2 (2d Cir. 2005).

4. In this particular case, it seems unfair to compel Defendants to arbitrate their waiver-by-litigation challenge because it is unclear if the arbitrator would be able to evaluate accurately the parties' involvement in this suit. Freaner, in filing his arbitration demand, failed to even inform the arbitrator that Defendants' counterclaim was being litigated in this Court. This omission further strengthens the case for judicial resolution of the issue of waiver.

## B. Merits of Defendants' Jurisdictional Challenges

### (1) The Panama Convention's Form Requirements

Article 1 of the Panama Convention provides, in relevant part:

An agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid. The agreement shall be set forth in an instrument signed by the parties, or in the form of an exchange of letters, telegrams, or telex communications.

There is little case law discussing this specific provision, see, e.g., Sidor, 1999 WL 632870, at *5; Ocean Products, Inc. v. Molinos Rio de la Plata, S.A., No. 98 CIV. 3487(DC), 1999 WL 239692, at *2 (S.D.N.Y. April 22, 1999); Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venez., 802 F.Supp. 1069, 1072 (S.D.N.Y.1992), yet Article 1's express language suggests that a valid arbitration agreement may take only two forms. First, the arbitration agreement may consist of a writing—either a submission agreement or an arbitral clause in a contract—that is signed by the parties. Second, the arbitration agreement may consist of an exchange of writings, in which case there is no requirement for a signature.

### (a) "[A]n instrument signed by the parties"

When an agreement to arbitrate is evidenced only by an arbitral clause in a printed contract, the Panama Convention plainly requires that the contract be signed by the parties. This interpretation is confirmed by analogous authority interpreting Article II(1) of the New York Convention, which sets forth the requirements for the formal validity of an arbitration agreement. Article II(1) of the New York Convention provides, in relevant part:

Each Contracting State shall recognize an agreement in writing under which the parties undertake to subject to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

Furthermore, Article II(2) states:

The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

The domestic case law reveals at least two conflicting interpretations of these foundational provisions of the New York Convention. See S.I. Strong, What Constitutes an "Agreement in Writing" in International Commercial Arbitration? Conflicts Between the New York Convention and the Federal Arbitration Act, 48 Stan. J. Int'l L. 47, 58–63 (2012). Some courts hold that Article II(2) requires only a submission agreement to be signed by the parties in order to be valid. On this reading, an arbitral clause in an unsigned contract is valid so long as the parties manifested their consent to the contract in any form. See, e.g., Sphere Drake Ins. PLC v. Marine Towing, Inc., 16 F.3d 666, 669 (5th Cir.1994). A majority of courts conclude, however, that Article II(2) requires that both types of arbitration agreements be signed by the parties in order to be valid.[5] See, e.g., Standard Bent Glass

---

5. Foreign courts also take divergent approaches to the interpretation of Article II(2). Most refuse, however, to give effect to arbitral clauses in unsigned contracts, even when there has been oral or tacit acceptance of the

*Corp. v. Glassrobots Oy,* 333 F.3d 440, 449 (3d Cir.2003); *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,* 186 F.3d 210, 214 (2d Cir.1999), *partially abrogated on other grounds by Sarhank Grp. v. Oracle Corp.,* 404 F.3d 657, 660 n. 2 (2d Cir.2005).

The more demanding interpretation of Article II(2) appears to be logically and grammatically correct, but it has the lamentable effect of rendering invalid many arbitration agreements that arise from informal commercial relationships. Consequently, enforcement of the signed writing requirement in such circumstances has been widely criticized, with several commentators arguing that interpretation of the New York Convention as a "minimum" standard of formal validity is clearly misguided and out of step with commercial practice. *See e.g.,* Born, *supra,* at 541 ("Despite the support it has attracted, an interpretation of Article II(2) as imposing a minimum form requirement is impossible to reconcile with either the text of Article VII(1) of the [New York] Convention or the basic purposes of the Convention."); Strong, *New York Convention, supra,* at 74–8 ("Ultimately, the minimalist approach falters because it fails to take into account the express language of the Article VII(1) ....").

According to these scholars, the New York Convention in fact permits courts to give effect to a broad range of arbitration agreements beyond those enumerated in Article II(2). First, Article VII(I) of the New York Convention explicitly allows parties to rely on provisions of national law if they are more favorable to arbitration than the Convention itself. Article VII(1) can be read to allow parties to invoke the

less demanding standard of formal validity articulated in Section 2 of the FAA.[6]

Second, Article II(2) can be interpreted as a non-exhaustive list of the types of arbitration agreements that satisfy the Convention's standard of formal validity. This approach would allow courts to add, over time, new types or categories of agreements that merit recognition and enforcement.

The Panama Convention discloses subtle, yet important, differences when compared with the New York Convention, however. Upon inspection of the two treaties, it appears that the textual, or legal, bases that may justify departure from, or modification of, the New York Convention's form requirements are absent from the Panama Convention.

To begin with, the express language of Article 1 of the Panama Convention clearly indicates that an arbitration agreement consisting exclusively of an arbitral clause in a contract is not valid unless the contract is signed by the parties. Unlike Article II(2) of the New York Convention, which can be plausibly interpreted to relieve the parties of this burden, the Panama Convention is unambiguous as to the need for signatures. *See* Born, *supra,* at 601 ("[The Panama Convention] appears to require that a contract be 'signed,' in contrast to at least some authority under the New York Convention avoiding the imposition of this requirement."); Bowman, *supra,* at 45 n. 132 ("The Panama Convention's definition plainly requires that the instrument containing the arbitration agreement must be signed by the parties.").

---

contract by the party resisting arbitration. *See* Born, *supra,* at 538–40.

**6.** Section 2 of the FAA requires courts to give effect to a "written provision" evidencing an

agreement to arbitrate. The signatures of the parties are not required, nor is there a need for both parties to manifest assent in writing.

The Panama Convention also does not include a "more-favorable-right" provision, similar to the New York Convention's Article VII(1). Article VII(1) permits for reliance on national laws that are more favorable to arbitration than the Convention itself. The Panama Convention does not appear to provide the parties to an arbitration agreement with this choice of law. *See* Bowman, *supra,* at 58 ("A . . . potentially significant difference between the two Conventions concerns the absence from the Panama Convention of a 'more-favorable-right' provision.").

Finally, Article 1 of the Panama Convention cannot reasonably be interpreted as a non-exhaustive list of valid arbitration agreements. Unlike Article II(2) of the New York Convention, Article 1 of the Panama Convention does not set forth a list that begins with the ambiguous term "include," nor does it contain any other textual guides indicating that the form requirement is meant to change or expand over time. The requirement of Article 1 appears to be exclusive.

■ In short, the Panama Convention provides no apparent grounds for enforcing an arbitral clause in an unsigned contract, absent a separate manifestation of assent in writing. This result may be out of step with contemporary commercial practice, but it appears to be sound in light of slight, yet meaningful, variations between the Panama and New York Conventions. Unlike the New York Convention, the Panama Convention seems not to contemplate reliance on less demanding national law standards of formal validity, such as Section 2 of the FAA.[7]

■ Here, Freaner's argument that Defendants accepted the printed contract by performance or, alternatively, by spoken words, does not satisfy this Court's reading of Article 1 of the Panama Convention. Freaner's contention that Defendants accepted the printed contract in a separate, unsigned e-mail raises the prospect that a valid arbitration agreement may have been formed through an "exchange of letters." This requirement is discussed below.

(b) "[A]n exchange of letters"

Article 1 of the Panama Convention provides that an arbitration agreement may also take the form of an "exchange of letters, telegraphs, or telex communications." An exchange involving contempo-

---

7. In *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela* one of the few courts to have explicitly addressed the Panama Convention's dorm requirements declined to give any weight whatsoever to linguistic differences between Article 1 of the Panama Convention and Article II(2) of the New York Convention. 802 F.Supp. 1069, 1072 (S.D.N.Y.1992). Following Congress' characterization of the Panama Convention as "modeled after" the New York Convention, the court reasoned that a "fundamental" departure from the latter, such as a "difference in definitions of enforceable arbitration agreements," could *not* possibly be intended by minor textual variation. *Id.* Thus, the court concluded that "there is no reason to accept, and every reason to reject, the notion that the conventions differ with respect to the form and content of the writings sufficient to contain an enforceable arbitration agreement." *Id.*

Nonetheless, the reasoning in *Progressive* does not require adoption of a relaxed standard of formal validity by analogy to the emerging scholarly consensus regarding non-application of the New York convention's form requirements. The Panama Convention expressly requires that the instrument containing the arbitration agreement be signed by the parties. *See* Bowman, *supra,* at 45 n. 32. With respect to the textual sources available for evading this requirement, the Panama and New York Conventions differ in ways that are at least notable, if not fundamental. These non-trivial differences between the two Conventions should be respected.

rary forms of communication that leave a record, such as fax or e-mail, is also believed to be sufficient. *See* Born, *supra*, at 597; Strong, *New York Convention*, *supra*, at 73.

This provision of the Convention requires that each party consent to the arbitration agreement in writing. The analogous terms of Article II(2) of the New York Convention support this reading, as most courts have refused to give effect under Article II(2) to an arbitral clause in a printed contract that is sent by one party and orally or tacitly accepted by another party. *See* Born, *supra*, at 593–95. Thus, Article 1's "exchange of letters" provision does not simply codify principles of mutual assent, but rather imposes a standard of formal validity for arbitration agreements that the parties cannot evade.

Nonetheless, Article 1 recognizes as valid any exchange of writings that evidences assent to an arbitration agreement. The exchange need not consist of a written offer and a written acceptance. *See* Born, *supra*, at 595–96 (suggesting that courts should "interpret the [New York Convention's analogous] requirement for an 'exchange' of written communications liberally, to include any documentary or electronic communication evidencing assent to an arbitration agreement, whether such assent is express or implied.")

Here, Freaner contends that a valid arbitration agreement is set forth in an exchange of e-mails between himself and Jose Humberto Guillin, Hotelera Coral's administrative manager. Guillin sent Freaner an e-mail on December 9, 2009, which read as follows:

> GOOD AFTERNOON
> ARIEL
> CAN YOU PLEASE SEND ME THE CONTRACT IN FORCE, I

> HAVE AN AUDIT.
> GREETINGS
> HBTO

Freaner responded to Guillin on December 10, 2009 with an e-mail that read as follows:

> Good afternoon. I attach contract in force.

The printed contract containing the arbitral clause was attached to Freaner's e-mail.

On December 11, 2009, Guillin responded with an e-mail that read as follows:

> received and confirmed.

Freaner apparently contends that Guillin's final e-mail constituted a written acceptance of the printed contract. That argument is untenable, however. Freaner's e-mail to Guillin does not constitute an offer creating a power of acceptance. Moreover, Guillin did not have actual or apparent authority to conclude such an agreement with Freaner on behalf of Valle or Hotelera Coral.

More pertinently, the exchange does not evidence Defendants' assent to the printed contract because it does not show that Defendants had at any point accepted the printed contract, tacitly or otherwise. Neither Guillin's generic request for "the contract in force," nor his subsequent e-mail confirming receipt, is specific or substantial enough to show that Defendants had already assented to the contract attached to Freaner's December 10, 2009 e-mail.

Guillin did not participate in the contract negotiations with Freaner. He was aware that Hotelera Coral was paying Freaner for design and advertising services on a monthly basis, but did not know which terms, if any, governed the parties' relationship. Freaner either was, or should have been, aware of Guillin's limited role by the time he received Guillin's e-mail,

nearly five months after Defendants' purported acceptance of the printed contract. This e-mail exchange, viewed in isolation or in light of the course of dealing between the parties, does not evidence Defendants' assent to the contract.

Accordingly, the Court declines to give effect to the arbitral clause in the printed contract. The Court **DENIES** Freaner's motion to compel arbitration because the alleged arbitration agreement is invalid under Article 1 of the Panama Convention.

### (2) Waiver of Arbitration

■ Although the Panama Convention does not explicitly identify waiver as a ground for non-enforcement of an arbitration agreement, the availability of the defense of waiver is believed to be implied. *See* Born, *supra*, at 737; Bowman, *supra*, at 51. Moreover, Chapter 1 of the FAA, the non-conflicting provisions of which are applicable in cases dealing with the Panama Convention by virtue of Section 307, also recognizes waiver and other traditional contract defenses as grounds for non-enforcement of an arbitration agreement.[8]

■ A determination that a party has waived a contractual right to arbitrate must take into account the strong federal policy favoring enforcement of arbitration agreements, particularly in cases involving the New York and Panama Conventions. *See Fisher v. A.G. Becker Paribas, Inc.,* 791 F.2d 691, 694 (9th Cir.1986).

■ Under Chapter 1 of the FAA, a party has waived its right to arbitrate a dispute only if it (1) had knowledge of its existing right to compel arbitration, (2)

acted inconsistently with that existing right, and (3) the party resisting arbitration suffered prejudice from the defendant's delay in moving to compel arbitration. *See Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712, 720–21(9th Cir.2012); *Fisher,* 791 F.2d at 694.

■ Waiver of arbitration may occur when a party participates in a lawsuit in violation of the arbitration agreement. Such conduct is inconsistent with an existing right to arbitrate if the party substantially invokes the litigation machinery prior to seeking arbitration. *See, e.g., Hooper v. Advance America, Cash Advance Centers of Mo., Inc.,* 589 F.3d 917, 921 (8th Cir.2009). The point at which involvement in litigation becomes substantial is determined on a case-by-case basis and may turn on the failure of a party to move to compel arbitration or stay litigation in a timely manner. *See, e.g., Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC,* 588 F.3d 963, 968 (8th Cir.2009).

Waiver of the right to arbitration also requires a finding of prejudice to the other party. "Prejudice refers to the inherent unfairness of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." M. Domke, 1 *Domke on Commercial Arbitration* § 23:10. "[T]he more involved a party becomes in litigation, the greater the chance that prejudice to the other party will be found." *Id.*

■ Here, Freaner waived his right to arbitrate by litigating this dispute in this Court for nearly 18 months before moving

---

**8.** Waiver has also been recognized as a legitimate, internationally accepted defense to enforcement of an arbitration agreement under Article II(3) of the New York Convention, which provides that a court may decline to refer a dispute to arbitration if the arbitration agreement is "null and void, inoperative or incapable of being performed." *See I.T.A.D. Assocs., Inc. v. Podar Bros.,* 636 F.2d 75, 77 (4th Cir.1981). Notably, the Panama Convention does not include a similar provision.

to compel arbitration. To begin with, it is indisputable that Freaner had knowledge of his purported right to arbitrate. Freaner drafted the printed contract containing the arbitral clause and attached a copy of it to his answer.

Second, Freaner's active participation in this lawsuit, through the summary judgment stage, was sufficiently extensive and substantial as to be inconsistent with an existing right to arbitrate. Freaner filed a timely answer to Defendants' counterclaim, in which he failed to assert arbitration as an affirmative defense. In his answer, Freaner also demanded trial by jury as to all issues raised by the counterclaim.[9]

Freaner also participated in an early neutral evaluation and several case management conferences before Magistrate Judge Dembin. Freaner initially argued that a timetable for discovery should not be set prior to a determination as to whether the court or the arbitrator had jurisdiction over Defendants' counterclaim. (*See* Resp. in Opp'n to Mot. to Compel Arbit., Ex. I, ECF No. 85–7). The Magistrate Judge apparently explained that the counterclaim was properly before this Court and that Freaner's filing of an arbitral demand would not automatically stay litigation or prevent the parties from moving forward with discovery, absent an effort by either of the parties to have the Court refer the matter to arbitration. (*See id.*)

Freaner subsequently participated actively in the discovery process. He responded to Defendants' numerous discovery requests, attended a deposition lasting two days, and also litigated certain discovery disputes before the Magistrate Judge. It is unclear if Freaner served any discovery requests on Defendants. After the close of discovery, Defendants filed a partial summary judgment motion and Freaner filed an opposition to the motion on the merits.

Although Freaner contends that he consistently and repeatedly asserted his right to arbitrate, Freaner failed to move for the Court to *give effect* to his right in a timely manner. This dispute was properly before the Court and was required to proceed apace in this forum until either or both of the parties moved for a referral to arbitration.[10] *See* Born, *supra,* at 737 ("[A] court's obligation to refer the parties to arbitration is conditioned upon the request of one of the parties. The corollary ... is that parties may waive their rights to arbitrate, either expressly or impliedly, by failing to request that those rights be given effect.")

Finally, Defendants have likely been prejudiced by Freaner's conduct. Defendants spent time and resources conducting discovery and filing a motion for summary judgment in this case, all of which might have been avoided had this matter been referred to arbitration at an earlier

---

**9.** Freaner's jury demand states: "Cross-defendant Ariel Freaner hereby demands trial by jury on all causes of action contained in Cross-claimant's Counterclaim unless the Court finds that these causes of action are to be decided by binding arbitration." (Answer, Sep. 27, 2011, ECF No. 17). This brief remark is insufficient to raise arbitration as a defense.

**10.** The relationship between courts and arbitral proceedings has been characterized as a "relay race," with the two forums taking on distinct responsibilities at different times. *See* Alan Redfern and Martin Hunter, *Law and Practice of International Commercial Arbitration* 343 (1999). Freaner's active participation in this suit, while simultaneously pressing claims under the same contract in a parallel arbitration, without informing the arbitrator of the pending litigation, is inconsistent with this dynamic.

stage.[11] These expenses are due primarily to Freaner's delay in moving to compel arbitration and so constitute a form of prejudice. Defendants were also prejudiced by Freaner's inconsistent effort to litigate and arbitrate the same dispute simultaneously. This scheme put Defendants in the position of either incurring unnecessary expenses by pressing their counterclaim in both proceedings, or risking a final award in the arbitral forum that might preclude them from litigating their counterclaim to a judgment in this Court. The expenses incurred by Defendants in filing and litigating their initial motion for a ruling regarding the arbitrator's jurisdiction was likely the result of Freaner's inconsistent conduct.

Accordingly, the Court finds that Freaner waived any right to arbitration that he may have had under the printed contract. The Court **DENIES** Freaner's motion to compel arbitration on this basis as well.

### (3) Non–Existence of the Arbitration Agreement

Article 1 of the Panama Convention recognizes that an "agreement" to submit disputes to arbitration is valid. The Convention thus incorporates the fundamental principle that arbitration is a matter of contract and must be a consensual arrangement between the parties. This principle is also recognized by Section 2 of the FAA, which provides for the validity of arbitration agreements evidenced by a "written provision in ... a contract" or a separate "agreement in writing."

Whether the parties agreed to arbitrate is determined by resort to ordinary principles of contract law. Matters of contract formation and mutual assent are typically determined with reference to applicable state law. *See, e.g., First Options,* 514 U.S. at 944, 115 S.Ct. 1920; *Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 154–55 (3d Cir.2001); *but see* Born, *supra,* at 491–92.

Here, Defendants have raised a genuine factual dispute as to whether there was mutual consent to a printed contract containing an arbitration clause. Defendants submit the affidavit of Hotelera Coral's general manager, Andres Martinez, which states, in relevant part:

12. I did not want to sign what I perceived as a one-sided written contract that was not in the best interests of Hotelera Coral and that contained clauses that I did not understand. I elected to submit the Service Agreement to the attorneys for Hotelera Coral.

13. Mr. Freaner also emailed me a copy of his "Service Agreement" for 2009. On several occasions, I told Mr. Freaner that I thought his "Service Agreement" was "leonino" and "unilateral," meaning that it was heavy-handed and one-sided. I further told Mr. Freaner that Hotelera Coral would honor its obligations and I expected Mr. Freaner to honor his obligations. I told Mr. Freaner that I could not sign his

---

**11.** Typically, prejudice is recognized where the party seeking arbitration has remained in the litigation long enough to take advantage of evidence-gathering procedures that would otherwise be unavailable in the arbitral forum, thereby wrongfully strengthening the position of one party in the arbitration at the expense of the other party. *See, e.g., Zwitserse Maatschappij Van Levensverzekering En Lijfrente v. ABN Int'l Capital Markets Corp.,* 996 F.2d 1478, 1479 (2d Cir.1993). When a party resisting arbitration has itself engaged in extensive discovery, however, it is unclear if the party may be said to have suffered prejudice as a result of those efforts. Nonetheless, it is indisputable that arbitration is designed to be more efficient and cost-effective than litigation for all parties involved, such that expenses incurred by a party as a result of another party's unreasonable delay in moving for referral to arbitration should at least be considered in evaluating prejudice.

"Service Agreement" as drafted, and that each party would honor its obligations by handshake unless we could agree on a formal written contract with fair and even-sided terms. Towards the end of the timeframe for the 2009 contract, I reiterated to Mr. Freaner that I could not sign his "Service Agreement" as drafted, and that I was worried because he was very much behind on his obligations to Hotelera Coral both under the $4,000.00 per month agreement ("iguala") and with regard to the numerous invoices for printed materials.

35. In January 2010, the attorneys for Hotelera Coral had sent some comments and some proposed revisions to Mr. Freaner.

36. To the best of my recollection, Mr. Freaner did not respond to the attorneys for Hotelera Coral until mid-April 2010.

37. In April 2010, Hotelera Coral's attorneys in Mexico were still proposing revisions to Mr. Freaner's proposed "Service Agreement."

38. To the best of my recollection, in the Spring of 2010, Mr. Freaner, an attorney or Hotelera Coral in Mexico … and I met in Tijuana to discuss Mr. Freaner's "Service Agreement". . . . I further recall that [my attorney] asked [Mr. Freaner] why he was so concerned about having Hotelera Coral sign the Service Agreement when it was Mr. Freaner who was not meeting his obligations and when there were only about three months left under the 2009 contract. One of the main points of disagreement was as to the forum for the 2009 contract. Hotelera Coral wanted the forum to be in Mexico. Mr. Freaner insisted that the forum had to be in the United States. The "Service Agreement" for 2009 was never accepted by Hotelera Coral.

39. In late May 2010 Mr. Freaner and I were still negotiating the possible signing of a formal contract for the 2009 contract.

42. I never told Mr. Freaner that his proposed "Service Agreement" had been approved by Hotelera Coral. I did tell Mr. Freaner that Hotelera Coral had accepted his offer to provide services at $4,000.00 per month for a sum of $48,000 over 12 months.

43. I do not know of any authorized representative of Hotelera Coral who told Mr. Freaner that his proposed Service Agreement had been approved by Hotelera Coral.

44. Since July 2009, I have been the General Manager, and it is my responsibility to decide whether to sign a proposed contract on behalf of Hotelera Coral and to negotiate the terms and conditions of any such contract, including the Service Agreement that Mr. Freaner submitted for the July 2009–June 2010 period.

45. I did *not* sign Mr. Freaner's proposed "Service Agreement"; nor did anyone else sign it on behalf of Hotelera Coral. I never agreed to accept it as it was written.

46. I do not recall that Mr. Freaner discussed the subject-matter of arbitration with me.

47. I do not know of any authorized representative of Hotelera Coral who discussed the subject-matter of arbitration with Mr. Freaner.

(Declaration of Andres Martinez in Support of Resp. in Opp'n to Mot. to Compel Arbit., ECF No. 85–2).

Defendants submissions appear to directly contradict Freaner's recollection of the contract negotiations. Mr. Freaner's declaration states, in relevant part:

9. I provided the 2009 Service Agreement to Hotelera on or about June 25, 2009.

10. Fernanda Beltran, Andres Martinez and Enrique Lutteroth, agents of Hotelera, informed me that the contract was approved.

14. Since Defendants did not immediately sign the 2009 Service Agreement after we began performing it, I made several attempts to obtain Defendants' signature on the contract. I was told not to worry and that the contract had been approved.

17. In the Fall of 2009, I met with Hotelera's attorney who proposed adding an "escape clause" to the 2009 Service Agreement. However, Hotelera never presented me with such a proposed modification to the contract and I never agreed to any such modification.

(Declaration of Ariel Freaner in Support of Mot. to Compel Arbit., ECF No. 82–2).

Under Section 4 of the FAA, which applies in this action by virtue of Section 307, the Court would ordinarily proceed to a summary determination of this issue. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to a trial thereof."). The determination would typically be made by a jury or, with the consent of the parties, by the Court, after an evidentiary hearing. *Id.* ("If no jury trial be demanded by the party alleged to be in default ... the court shall hear and determine such issue.").

Nonetheless, the Court finds it unnecessary to proceed to a definitive resolution of the outstanding factual dispute regarding formation of the contract because the matters discussed above are dispositive with respect to the validity of the arbitral clause. Accordingly, the Court declines to consider this issue further.

## MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1. Standard of Review

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Id.* When the Court weighs the evidence to be presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255, 106 S.Ct. 2505.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The movant can carry his burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating to the Court that the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23, 106 S.Ct. 2548.

Once the moving party satisfies this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Furthermore, the nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The nonmoving party must identify those facts of record that would contradict the facts identified by the movant.

### 2. Analysis

Defendants move for summary judgment on part of their counterclaim for breach of contract. Defendants argue that it is indisputable that Freaner failed to deliver 17 work orders that he was obligated to complete and that Defendants are thus entitled to $17,280 in damages as a result of their overpayment.

Freaner opposes the motion on the ground that there remain genuine issues of material fact regarding (1) the terms of the contract, and in particular, whether the parties are bound by the printed contract, as Freaner contends, or by an informal, oral agreement, as Defendants allege; and, (2) the value of the 17 incomplete work orders.

### A. *Liability*

Rule 56 provides, in relevant part:

**(g) Failing to Grant All the Requested Relief.** If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.

Defendants argue that the Court must grant their partial summary judgment motion at least with respect to liability because Freaner's opposition essentially concedes that he failed to deliver the 17 work orders. Freaner maintains that it would be error to grant any part of the motion in light of the outstanding issues of material fact regarding the terms of the parties' agreement.

Here, Freaner's contractual obligation to deliver the specified work orders appears to be identical under either party's version of the contract terms. Thus, although there remains a factual dispute regarding contract formation, the outstanding factual issues are immaterial with respect to the merits of Defendants' breach of contract claim.

In sum, there appears to be no dispute that Freaner had a contractual obligation to deliver the requested work product and that he failed to do so.[12] Accordingly, the Court **GRANTS IN PART** Defendants' motion for partial summary judgment and enters summary judgment against Freaner as to liability only.

### B. *Damages*

Defendants contend that Freaner's failure to deliver the 17 work orders entitles them to damages in the amount of $17,280. According to Defendants, Freaner was paid $48,000 over a one-year period, during which Defendants sent Freaner 47 work orders. Defendants calculate that the 17 undelivered work orders resulted in

---

**12.** It is unclear if Freaner is suggesting that there may not be an enforceable contract between the parties at all, such Defendants would be obligated to resort to non-contract theories of recovery, which they have not pleaded here. That is highly unlikely, however. In any case, the parties have stipulated to the existence of an agreement.

overpayment equivalent to 17/47, or 36%, of $48,000, which yields approximately $17,280.

According to Freaner, Defendants' calculation of damages is far too simplistic. Freaner maintains that Defendants' 47 work orders actually included 129 separate requests for work and that Freaner fulfilled all but 33 of those requests. Thus, Freaner argues that there is a genuine factual dispute as to the value of the undelivered work product.

█ Here, the Court agrees with Freaner that there remain genuine issues of material fact as to the extent of Defendants' overpayment. Accordingly, the Court **DENIES IN PART** Defendants' motion for partial summary judgment and declines to enter judgment against Freaner with respect to the issue of damages. Defendants must provide evidence indicating the amount of damages to which they are entitled as a consequence of Freaner's failure to complete the promised work.

## PENDING ARBITRATION PROCEEDINGS

In its prior Order, this Court declined to dismiss with prejudice Freaner's breach of contract claim because Freaner's delay in commencing arbitration was not so egregious as to warrant this severe sanction. Nonetheless, the Court concluded that Freaner's unreasonably lengthy delay in commencing arbitral proceedings carried a substantial risk of prejudice to Defendants, such that further delays would be unacceptable.

█ Although the Court previously referred the dispute arising out of the June 2008 Service Agreement to arbitration, the Court retains jurisdiction to remedy dilatory tactics employed by a party to the arbitration. *See Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 653 (9th Cir.1991).

The Court's all-important obligation to refrain from interfering in an ongoing arbitration proceeding does not preclude appropriate action to prevent a breakdown of the arbitral process. *See id.*

In light of the risk of prejudice to Defendants, the parties must proceed immediately to arbitration and must resolve the pending contract dispute by *October 31, 2013.* The parties must file with the Court a notice of completion of said arbitration before this date. If necessary, the parties may jointly move for a extension of this deadline at any time.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Freaner's motion to compel arbitration, **GRANTS IN PART** Defendants' motion for partial summary judgment as to liability only, **DENIES IN PART** Defendants' motion as to damages, and **SETS** a deadline of *October 31, 2013* for the completion of pending arbitration proceedings.

**IT IS SO ORDERED.**